Grant THORNTON, LLP, Plaintiff,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, Defendant;

and

Federal Deposit Insurance Corporation, Plaintiff,

v.

Grant Thornton, LLP, Defendant;

and

Gary Ellis, Plaintiff,

v.

Grant Thornton, LLP, Defendant.

Civil Action Nos. 1:00–0655, 1:03–2129, 1:04–0043.

United States District Court, S.D. West Virginia.

March 14, 2007.

See, also, 2007 WL 4591735.

Andrew J. Morris, Mark W. Ryan, Mayer Brown, Washington, DC, Catherine L. Doyle, Stanley J. Parzen, Mayer Brown, Chicago, IL, John H. Tinney, John H. Tinney, Jr., Kimberley R. Fields, The Tinney Law Firm, Charleston, WV, for Plaintiff.

Brad A. Harman, Clint R. Latham, David Mullin, John M. Brown, John G. Turner, III, Mullin Hoard & Brown, Amarillo, TX, Charles T. Miller, Stephen M. Horn, U.S. Attorney's Office, Charleston, WV, John A. Davidovich, John Wessling, Mary P. Davis, Federal Deposit Insurance Corporation, Washington, DC, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

DAVID A. FABER, Chief Judge.

### INTRODUCTION

A bench trial was held on May 17, 2004, through June 10, 2004. Closing arguments were held on August 20, 2004. Set forth herein are the court's findings of fact and conclusions of law pursuant to Fed. R.Civ.P. 52.

Because this case was tried before the court as a bench trial, the court's findings are presumed to be based on admissible evidence. *Fishing Fleet, Inc. v. Trident Ins. Co., Ltd.*, 598 F.2d 925, 929 (5th Cir. 1979); *see also Chicago Title Ins. Co. v. IMG Exeter Associates Ltd. P'ship*, 985 F.2d 553, 1993 WL 27392 at *4 (4th Cir. 1993) (unpublished); *see also Harris v. Rivera*, 454 U.S. 339, 346, 102 S.Ct. 460, 70 L.Ed.2d 530 (1981) ("In bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions."). Accordingly, the court finds it unnecessary to rule on each separate objection raised by the parties. The court has considered those objections relating to the evidence supporting the findings contained herein and, to the extent such objections relate to the evidence which the court cites in support of its findings, such objections are hereby overruled.

### FINDINGS OF FACT

#### I. Background

1. The First National Bank of Keystone ("Keystone" or the "Bank") located in Keystone, McDowell County, West Virginia, was incorporated in 1904 under the National Banking Act. GT Ex. 22. Prior to 1992, Keystone was a small community bank servicing primarily McDowell County and the surrounding area. Keystone was a national banking association within the Federal Reserve System, the deposits of which were insured by the Federal Deposit Insurance Corporation ("FDIC"). Keystone's principal place of business was in West Virginia. Prior to his death in 1997, J. Knox McConnell, the Bank's president and its largest shareholder, controlled Keystone. FDIC Ex. 431 at 2–3.

2. From at least 1992 through October 1997, Keystone's board of directors consisted of two inside directors, J. Knox McConnell and Billie Cherry, and outside directors Michael Gibson, a local attorney; Andres Rago, a local doctor; Julian Budnick, a retired furniture salesman; and Louis Pais, a retired beer distributor. When McConnell died in October 1997, Terry Church replaced him on the board. At the same time, Billie Cherry became president of the Bank, and Melissa Quizenbeury, a long-time employee, became a director. Gibson, May 20, 2004, Tr. at 7, 10; FDIC Exs. 90, 124, 248 at 2; GT Exs. 208, 625. After McConnell's death, Church controlled every material aspect of the Bank's operations. Carney, May 19, 2004, Tr. at 69–71; Quay, June 4, 2004, Tr. at 13–14; FDIC Ex. 417 at 3. Church was also the executrix of McConnell's estate, giving her control of the largest single block of Keystone stock. FDIC Ex. 248 at 2.

3. In December 1998, Julian Budnick resigned from the board and was replaced by his son Victor Budnick, an attorney. Budnick, May 18, 2004, Tr. at 86–88; Gibson, May 20, 2004, Tr. at 10. In March 1999, two new directors were elected: Bernard Kaufman, a retired attorney and investor, and Daniel Halsey, a local car dealer. Most of the outside directors owned sizable blocks of Keystone stock, and outside director Gibson actually bought more stock during the last few months of the Bank's existence. Gibson, May 20, 2004, Tr. at 58; FDIC Ex. 248 at 2, FDIC Exs. 263, 880.

4. This civil action arises from the fraudulent operation and eventual collapse of Keystone. The fraud was conceived and perpetrated by senior bank management and continued for years until detected. In addition to McConnell, who died in October, 1997, before the Bank was closed, the principal perpetrators of the fraud, all Keystone insiders, were Terry Church, Michael Graham and Billie Cherry. FDIC Exs. 431, 432. Church, Graham and Cherry have all been convicted of numerous felonies, their convictions have been affirmed on appeal, and all three were sentenced to lengthy terms of incarceration.[1] FDIC Exs. 430, 433, 434, 435, 558, 560, and 579. For several years the wrongdoers successfully concealed the fraud from the public, from the Bank's examiners, from the Bank's board of directors, and even from some of Keystone's own senior management.

5. Central to the fraud was an investment strategy that involved securitization of high risk mortgage loans. Beginning in 1992, Keystone originated nineteen securitizations over a six-year period. GT Ex. 514. Keystone would acquire Federal Housing Authority ("FHA") or high loan to value real estate mortgage loans from around the United States, pool a group of these loans, and sell interests in the pool through underwriters to sophisticated investors. GT Ex. 22. The pooled loans were serviced by third-party loan servicers; principal among these servicers were Advanta and Compu–Link. GT Ex. 22. Keystone retained residual interests ("residuals") in each loan securitization. GT Ex. 22. The residuals were subordinated securities that would receive payments only after all expenses were paid and all investors in each securitization pool were paid. GT. Ex. 22. In short, Keystone stood to profit from a securitization only after everyone else was paid. The residuals were assigned a value that was carried on the books of the Bank as an asset. Over time, the residual evaluations came to represent a significant portion of the Bank's book value. GT Ex. 22.

1. On December 29, 2006, Cherry died of a cerebral hemorrhage while in federal custody.

6. From 1993 until 1998 when the last loan securitization was completed, the size and frequency of these transactions expanded from about $33 million to approximately $565 million for the last one in September 1998. FDIC Ex. 431 at 3. All told, Keystone acquired and securitized over 120,000 loans with a total value in excess of $2.6 billion. FDIC Ex. 431 at 3. Keystone appeared to be an exceptionally profitable bank, whose assets purportedly grew from $107 million in 1992 to over $1.1 billion in 1999. FDIC Ex. 431 at 3; GT Ex. 22.

7. In reality, the securitization program proved highly unprofitable. Owing to the risky nature of many of the underlying mortgage loans, the failure rate was excessive. As a result, the residual interests retained by the Bank proved highly speculative and, in actuality, they did not perform very well. Malami, May 26, 2004, Tr. at 77–134; Potter, May 26, 2004, Tr. at 159–60; Potter, May 27, 2004, Tr. at 34–35. Keystone's valuation of the residuals was greater than their market value. Quay, June 4, 2004, Tr. at 29; FDIC Ex. 286. McConnell, Church, and others concealed the failure of the securitizations by falsifying the Bank's books. FDIC Ex. 431. Bogus entries hid the true financial condition of the Bank from the Bank's directors, shareholders, depositors and regulators. FDIC Ex. 431. Among the bogus documents were false remittance reports prepared by Graham and given to examiners from the Office of the Comptroller of the Currency ("OCC"). At the same time, the wrongdoers embezzled large sums from the Bank, covering their theft with other false entries in the Bank's books. FDIC Ex. 431.

8. The embezzlement of funds and the falsification of Keystone's financial records were both integral parts of the fraudulent scheme. The scheme participants booked false credits to interest income to make it appear that Keystone was highly profitable and booked false debits to loans to fraudulently inflate assets and capital—which made this a very common ("a garden variety") form of fraud. These fraudulent entries, and their reflection in the Bank's financial statements, enabled Keystone's corrupt management to continue to embezzle funds and conceal their earlier embezzlements. Carmichael, May 24, 2004, Tr. at 36–41; Carmichael, May 25, 2004, Tr. at 30–31; Goldman, June 9, 2004, Tr. at 83–84.

9. One of the boldest acts of fraud designed to conceal the Bank's true financial condition occurred when approximately $515 million in loans were sold by Keystone, but continued to be carried on the Bank's books as assets. FDIC Ex. 431; GT Ex. 22. Discovery of these fraudulent entries would have revealed at once the fraud and the Bank's insolvency, resulting in the Bank's immediate seizure and closure by federal regulators. Johnson, May 17, 2004, Tr. at 148; C. Wilson, May 17, 2004, Tr. at 240.

*II. Hiring of Grant Thornton*

10. Keystone had a long history of conflict with federal bank examiners and regulators. GT Ex. 22. In May, 1998, the OCC sought civil money penalties against Keystone's management and board for repeatedly filing inaccurate call reports. Casey, June 1, 2004, Tr. at 105; Gibson, May 20, 2004, Tr. at 12; FDIC Ex. 64 at 5; FDIC Ex. 182 at 31; FDIC Ex. 183 at 48. Call reports are detailed statements of a bank's financial condition that must be filed with the FDIC at the end of each quarter. Carney, May 19, 2004, Tr. at 103; FDIC Exs. 106, 171, 270, 323.

11. In examinations from 1995 to 1998, the OCC repeatedly criticized Keystone's management and records. GT Exs. 22, 243; FDIC Exs. 182, 183. The OCC asked for additional civil monetary penal-

ties when it discovered over $100 million in errors in Keystone's accounting records. Carney, May 19, 2004, Tr. at 62–63; Goldman, June 9, 2004, Tr. at 111. In its 1998 examination report, the OCC stated that Keystone's management had demonstrated an unwillingness or inability to follow appropriate accounting guidelines and comply with applicable laws and regulations. FDIC Ex. 183 at 3; GT Ex. 22. In the same examination, the OCC stated that Keystone had not filed an accurate call report the last seven quarters, that the Bank was willfully violating brokered deposit restrictions, and that data was being manipulated to enhance Keystone's capital position. FDIC Ex. 183 at 22, 41, 48. At one point, the OCC, suspecting that McConnell and Church were involved in an illegal kickback scheme concerning appraisal fees, made a criminal referral. FDIC Ex. 180; Quay, June 4, 2004, Tr. at 17–20; GT Ex. 22. The OCC discovered that Graham had made an "input error" of $31 million while entering data on loan residual evaluations, and criticized numerous other actions of Bank management designed to enhance Keystone's capital position as reflected by the Bank's records. FDIC Ex. 183 at 48. Over time a hostile relationship developed between Keystone officials and the regulators. GT Ex. 22. Church and McConnell (prior to his death) were at the center of this conflict. GT Ex. 22.

12. By the Spring of 1998, conflict between Keystone and the regulators had reached a critical juncture. In May of 1998, the OCC required Keystone to enter into a Formal Agreement obligating Keystone to take specific steps to improve its regulatory posture and financial condition. FDIC Ex. 64; Gibson, May 20, 2004, Tr. at 12. This included retaining a nationally recognized independent accounting firm. Gibson, May 20, 2004, Tr. at 14; Buenger, June 2, 2004, Tr. at 179–81; FDIC Exs. 64, 228. Discussions followed between Bank officials and defendant Grant Thornton LLP ("Grant Thornton") concerning the possible employment of Grant Thornton as the Bank's outside auditor. Grant Thornton knew that the Bank had significant accounting problems and was aware of the troubled relationship between the Bank and federal regulatory authorities. Buenger, June 2, 2004, Tr. at 179–81; Quay, June 3, 2004, Tr. at 15; FDIC Exs. 64, 228.

13. Between July 17 and August 21, 1998, appropriate officials at Grant Thornton approved acceptance of the Bank as a client. Quay, June 3, 2004, Tr. at 24. While the approval process was taking place, Stanley Quay, Grant Thornton's partner who was to be in charge of the audit, drafted a proposal covering the services he expected Grant Thornton to perform for the Bank. Quay, June 3, 2004, Tr. at 24–25; FDIC Ex. 75. Under this proposal, there were two principal levels of service Grant Thornton was to perform for the Bank: (1) An audit of the Bank's consolidated financial statements as of December 31, 1998; and (2) Completion of certain "agreed-upon-procedures" relative to elements of the Bank's financial statements beginning quarterly as of June 30, 1998. Quay, June 3, 2004, Tr. at 25–26.

14. On or about July 27, 1998, the OCC indicated it had no objection to the hiring of Grant Thornton by the Bank. Gibson, May 20, 2004, Tr. at 67–68; FDIC Ex. 79. Grant Thornton began its work at the Bank on or about August 12, 1998. Carmichael, May 24, 2004, Tr. at 110–11; Casey, June 1, 2004, Tr. at 99; Gibson, May 20, 2004, Tr. at 69–70; FDIC Ex. 91.

15. On September 10, 1998, Quay prepared and signed an engagement letter by which Grant Thornton agreed to perform an audit of Keystone's December 31, 1998, financial statements in accordance with Generally Accepted Auditing Standards

("GAAS"). Quay, June 3, 2004, Tr. at 28; FDIC Ex. 98. Billie Cherry signed the letter on behalf of Keystone on February 5, 1999. Quay, June 3, 2004, Tr. at 28–29; FDIC Ex. 98.

16. Stan Quay was the lead Grant Thornton partner on the engagement. FDIC Ex. 75. Susan Buenger, a junior manager, performed substantial work on the engagement. FDIC Ex. 75. Quay reviewed the Formal Agreement, and was familiar with its terms. Quay, June 3, 2004, Tr. at 18–19.

*III. Grant Thornton's Standard of Care*

17. The American Institute of Certified Public Accountants (AICPA) is a national professional organization for CPAs. During the time period involved, the AICPA set the professional standards that applied to the work of CPAs. GAAS, promulgated by the AICPA, are the standards applicable to auditing functions. GAAS is generally accepted as the minimum standard of professional conduct in performing an audit. Generally Accepted Accounting Principles ("GAAP") "encompass the convention, rules, and procedures necessary to define accepted accounting practice at a particular time." Carmichael, May 24, 2004, Tr. at 11–14.

18. Due professional care under GAAS requires the auditor to exercise professional skepticism. Carmichael, May 24, 2004, Tr. at 23. Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence. Carmichael, May 24, 2004, Tr. at 27–29; Buenger, June 2, 2004, Tr. at 62; Goldman, June 9, 2004, Tr. at 19; GT Ex. 266 (AU 230.07). The auditor has the responsibility to plan and perform the audit to obtain reasonable assurance that the financial statements are free of material misstatement, whether caused by error or fraud. Carmichael, May 24, 2004, Tr. at 32–34; Buenger, June 2, 2004, Tr. at 62–63; Quay, June 3, 2004, Tr. at 151; FDIC Exs. 438, 473 (AU 110.02). "When considering the auditor's responsibility to obtain reasonable assurance that the financial statements are free from material misstatement, there is no important distinction between errors and fraud." GT Ex. 268 (AU 312.08).

19. An auditor should have a "show me" attitude, and not accept unsubstantiated assertions by management. Buenger, June 2, 2004, Tr. at 63; Carmichael, May 24, 2004, Tr. at 27–29; FDIC Ex. 728. When applying procedures to the client's records, schedules and supporting data, the auditor should be on guard against accepting documents at face value. Buenger, June 2, 2004, Tr. at 63–64; Goldman, June 9, 2004, Tr. at 38–39; Carmichael, May 24, 2004, Tr. at 25.

20. If there is a high risk of fraud, the auditor ought to employ a heightened professional skepticism. Carmichael, May 24, 2004, Tr. at 29–31. Grant Thornton had many reasons to employ a heightened professional skepticism in its audit of Keystone's financial statements. Grant Thornton rated the Keystone audit maximum risk. Buenger, June 2, 2004, at Tr. 64; Carmichael, May 24, 2004, Tr. at 29; FDIC Ex. 174. It was the highest risk audit on which Buenger and Quay had ever worked. Buenger, June 2, 2004, Tr. at 64; Quay, June 3, 2004, Tr. at 189. Quay and Buenger testified that their "fraud antenna" were up as high as they could get. Buenger, June 2, 2004, Tr. at 64; Quay, June 3, 2004, Tr. at 189.

*IV. Grant Thornton's Failure to Check the Remittances From Servicers*

21. Due professional care is to be exercised in the performance of the audit and the preparation of the report. GT Ex. 262 (AU 150.02); GT Ex. 266 (AU 230.01).

22. The auditor has the responsibility to plan and perform the audit to obtain reasonable assurance about whether the

financial statements are free of material misstatement, whether caused by error or fraud. Carmichael, May 24, 2004, Tr. at 32–36; FDIC Ex. 473 (AU 110.02).

23. The auditor should specifically assess the risk of material misstatement due to fraud and should consider that assessment in designing the audit procedures to be performed. Carmichael, May 24, 2004, Tr. at 34–36; FDIC Ex. 695 (AU 316.12).

24. As already noted, the risk of material misstatement in Keystone's financial statements due to error or fraud was high, and Grant Thornton had already reached that conclusion before its year-end 1998 audit of Keystone commenced. Carmichael, May 24, 2004, Tr. at 94.

25. Buenger was responsible for testing Keystone's interest income during the year-end, 1998 audit. Keystone's management was reporting $98.8 million in interest income from loans owned by Keystone during 1998. Buenger, June 2, 2004, Tr. at 78. Over $65 million of the interest income was fraudulent and nonexistent. Carmichael, May 24, 2004, Tr. at 41.

26. Buenger performed the interest income testing in March, 1999. Buenger did not perform a test of details, which would have entailed looking for underlying support for the recorded item. Carmichael, May 24, 2004, Tr. at 49. Buenger did not examine remittance records of interest income. It would only have taken a short time to check the remittance records to verify the interest income. By tracking the ten remittances showing income for 1998 from loan servicer Compu–Link into Keystone's bank statement, Buenger could have verified 80–90% of the interest income. Buenger, June 2, 2004, Tr. at 71–93; Carmichael, May 24, 2004, Tr. at 100–01; Carmichael, May 25, 2004, Tr. at 23–25, 154–57; G. Ellis, May 22, 2004, Tr. at 78–80, 86, 94–95; Johnson, May 17, 2004, Tr. at 184–87; Quay, June 3, 2004, Tr. at 154–56; Terry Depo., November 16, 2002, pp. 14–15, 17–25, 31–34, 36–45 (FDIC Ex. 902).

27. GAAS requires an auditor to obtain the best evidence available within the time constraints and money constraints applicable to the engagement. Buenger, June 2, 2004, Tr. at 90. In this case, it would have been less time consuming and costly to perform a test of details rather than the analytical test that Buenger performed because the bulk of the interest income came from one servicer. Grant Thornton would only need to look at twelve remittances to very effectively substantiate most of the interest income. Carmichael, May 24, 2004, Tr. at 100–01.

28. Instead, the primary procedure that Buenger relied on to test interest income was an ineffective "analytical test." This test compared recorded interest income for the annual period to the average balance of loans outstanding during the same period, as reflected in the quarterly average balances reported in Keystone's call reports, to calculate an annual yield. Carmichael, May 24, 2004, Tr. at 84–85, 97–98. Buenger then considered the reasonableness of this calculated expectation of the yield based on her understanding of the industry yield on the same types of loans. Buenger, June 1, 2004, Tr. at 180–81; Carmichael, May 24, 2004, Tr. at 84–85, 97–98; FDIC Ex. 164.

29. The analytical test that Buenger did to test interest income only considered information provided by management. Carmichael, May 24, 2004, Tr. at 90. The data that Buenger obtained in her analytical testing was not independent of the entity, was not from a person independent of those responsible for the amount being audited, was not developed under a reliable system with adequate controls, and Grant Thornton had determined that the prior auditors were incompetent. Carmichael, May 24, 2004, Tr. at 98–100. Buen-

ger used only three items of information in her analytical test. Goldman, June 9, 2004, Tr. at 29–30; Quay, June 4, 2004, Tr. at 10–13. The first was the average balance of owned loans reported on Keystone's call reports. Goldman, June 9, 2004, Tr. at 30. Buenger and Quay knew that the OCC had imposed civil money penalties on Keystone for filing inaccurate call reports; in fact, the OCC said that Keystone had not filed an accurate call report in the last seven quarters. Quay, June 4, 2004, Tr. at 10–11. Buenger decided not to use the call report information for March 31, 1998 because the OCC had required the call report to be restated, but she then proceeded to use the other 1998 call reports despite knowing that the OCC had determined those call reports were also inaccurate. Buenger, June 2, 2004, Tr. at 106–09. Thus, Buenger knew the call report information she used was of questionable reliability. Carmichael, May 24, 2004, Tr. at 89–90, 98–99; Goldman, June 9, 2004, Tr. at 32–33; Quay, June 3, 2004, Tr. at 151.

30. The second piece of information Buenger used in her analytical test was a chart of Keystone's month end loan inventories for 1998 that was provided to her by Graham. According to Buenger's memorandum to the file on Keystone's loan purchasing, Keystone purchased loans throughout the year, and then sold them into securitizations. Buenger, June 2, 2004, Tr. at 96–98; FDIC Ex. 181. Buenger believed Keystone was funding these purchases with brokered deposits. Buenger, June 2, 2004, Tr. at 95. Keystone's loan inventory should have dropped substantially at the time of the securitizations because the loans were sold into the securitizations. Buenger, June 2, 2004, Tr. at 97–98. Keystone had two securitizations in 1998—one in May for $275 million and one in September for $565 million. But according to the Graham chart, the Keystone loan inventory only dropped slightly in those months—with a $47 million drop in May, 1998 and a $32 million drop in September, 1998. FDIC Ex. 164. Finally, there were large discrepancies between the total loan inventories on Graham's chart and the total loan inventories reflected in Grant Thornton's workpapers on its agreed upon procedures. FDIC Ex. 164; Buenger, June 2, 2004, Tr. at 103–04. For example, as of June 30, 1998, Graham's chart reflected Keystone owned $566 million in loans, but Grant Thornton's reconciliation of loans as of the same date reflected an inventory of only $402 million. FDIC Ex. 164; Buenger, June 2, 2004, Tr. at 103–04. Buenger realized the numbers in Graham's chart were not reasonable, and didn't tie to any of the other numbers of which she was aware. Buenger, June 2, 2004, Tr. at 95–104, 130–31; Quay, June 4, 2004, Tr. at 8–10; FDIC Exs. 164, 915. Nevertheless, neither Buenger nor Quay asked Graham to explain why the loan balances that he provided Buenger made no sense. Buenger, June 2, 2004, Tr. at 103–04; Quay, June 4, 2004, Tr. at 9–10. Even though she had determined that Graham's chart made "no sense," Buenger continued to use the January through March 1998 loan inventories in Graham's chart in her analytical test of income. Buenger, June 2, 2004, Tr. at 104–06, 109–10; Goldman, June 9, 2004, Tr. at 26–27, 150; Quay, June 3, 2004, Tr. at 150–51. Buenger violated GAAS by failing to investigate how Graham provided her bogus loan inventories that made "no sense," by failing to investigate how Graham had made the $31 million "input error" on the residual valuation, and by using information that she knew contained material errors in her analytical test. Goldman, June 9, 2004, Tr. at 19–29, 31–32.

31. The third piece of information used by Buenger in her analytical test was a "remittance report," reflecting $10 million in income from Compu–Link during the

month of December, 1998. FDIC Ex. 165. One of Graham's subordinates, Debbie Watkins, provided the "remittance report" to Buenger with a letter from Forest Krumm of Compu–Link. Buenger, June 1, 2004, Tr. at 187; Buenger, June 2, 2004, Tr. at 64–65. The Krumm letter states that "enclosed is a trial balance." FDIC Ex. 165. The letter does not reference a "remittance report" as being enclosed. FDIC Ex. 165. The "remittance report" contains no identifying markings to indicate that it is a true Compu–Link record. FDIC Ex. 165. Under GAAS, Buenger should have investigated these anomalies, and could not rely on the "remittance report" until she cleared them up. Buenger violated GAAS by using data on the remittance report in her analytical test, and by failing to investigate the anomalies in the information she was provided. Buenger, June 2, 2004, Tr. at 64–65, 72–73; Carmichael, May 24, 2004, Tr. at 102–05; Carmichael, May 25, 2004, Tr. at 158–59, 169–70; FDIC Ex. 165.

32. Detailed testing is better and provides stronger evidence than analytical testing. Goldman, June 9, 2004, Tr. at 46–47. At trial, Buenger professed not to know that there was a difference between an analytical test and a test of details. Buenger, June 2, 2004, Tr. at 71. An auditor with Buenger's level of training and experience should know the difference between an analytical test and a test of details. Goldman, June 9, 2004, Tr. at 46.

33. After the OCC reported the $500 million of missing loans in August, 1999, Grant Thornton's first step was to look for check and wire remittances showing the interest income, but they could not find any evidence to support $500 million in loans. Carmichael, May 24, 2004, Tr. at 85–86; Quay, June 3, 2004, Tr. at 154–56.

34. In August, 1999, Buenger and Quay asked Graham and Church to provide proof of the income from the loans, and they came back and said they couldn't find it. Quay, June 3, 2004, Tr. at 154–56. Graham and Church had every reason to produce whatever proof they could to support the income from loans. If Buenger and Quay had asked for the same proof in March, 1999, the result would likely have been the same: Church and Graham would not have been able to provide proof of the income. Buenger, June 2, 2004, Tr. at 79–90; Carmichael, May 24, 2004, Tr. at 101.

35. When Quay tested the more than $11 million in income from the residuals during the year-end, 1998 audit, he performed detailed testing procedures by actually examining the remittances, the checks, and wires from the servicers. Quay decided that the best way to test the residual income was to trace the actual remittances into the cash accounts. Buenger, June 2, 2004, Tr. at 78–79; Goldman, June 9, 2004, Tr. at 47–48; Quay, June 3, 2004, Tr. at 152–54; Carmichael, May 24, 2004, Tr. at 96; FDIC Ex. 188. The fact that Quay used detailed testing procedures to test the residual income is further evidence that Buenger should have done the same when she tested the interest income, especially given the fact that the amount of interest income Keystone was reporting was $98 million.

36. Under GAAS, AU 329.16 states the following concerning the reliability of data used in analytical procedures:

> The auditor should assess the reliability of the data by considering the source of the data and the conditions under which it was gathered, as well as other knowledge the auditor may have about the data. The following factors influence the auditor's consideration of the reliability of data for purposes of achieving audit objectives:
>
> > Whether the data was obtained from independent sources outside the entity or from sources within the entity.

Whether sources within the entity were independent of those who are responsible for the amount being audited.

Whether the system was developed under a reliable system with adequate controls.

Whether the data was subjected to audit testing in the current or prior year.

Whether the expectations were developed using data from a variety of sources.

FDIC Ex. 715.

37. In Grant Thornton's audit of Keystone, potential misstatements in interest income would be apparent in the remittance records—as they were in August, 1999. Detailed evidence was readily available and was not voluminous. Carmichael, May 24, 2004, Tr. at 91–92; Johnson, May 17, 2004, Tr. at 184–87; FDIC Ex. 548.

38. Quay and Buenger had rated the Keystone audit a "C" or "comprehensive" audit. Carmichael, May 24, 2004, Tr. at 92–94, 96–97; FDIC Ex. 436. Although Grant Thornton's audit manual states that a "C" rated audit generally concentrates on tests of details for income statement accounts, Quay and Buenger did not use tests of details for a majority of the accounts, and instead only used tests of details for two of the accounts. Goldman, June 9, 2004, Tr. at 51–52.

39. In March, 1999, given the high risk of material misstatement in Keystone's financial statements, and the fact that Keystone's $98 million in interest income was more than 90% of Keystone's reported income, Buenger should have tested Keystone's interest income for 1998 by reviewing the remittance records of interest income for 1998. Her failure to do so was a violation of GAAS. Carmichael, May 24, 2004, Tr. at 30, 84–85, 94–96.

40. If Buenger had followed GAAS by testing Keystone's interest income for 1998 by reviewing the remittance records of interest income for 1998, it is more likely than not she would have discovered the loan inventory fraud in March, 1999, reported it to Keystone's board, Keystone's president Owen Carney, and the OCC, and Keystone would have been closed by March 30, 1999. Budnick, May 18, 2004, Tr. at 122; Buenger, June 2, 2004, Tr. at 79–80; Carney, May 19, 2004, Tr. at 101; Carmichael, May 24, 2004, Tr. at 31, 41–42; Carmichael, May 25, 2004, Tr. at 30–31; Gibson, May 20, 2004, Tr. at 34–37; Johnson, May 17, 2004, Tr. at 138–44, 148, 184–87; Potter, May 27, 2004, Tr. at 13; Quay, June 3, 2004, Tr. at 167–68; C. Wilson, May 17, 2004, Tr. at 240; FDIC Exs. 408, 548.

## V. Grant Thornton's Failure to Properly Prepare for the Confirmation Process

41. Keystone's December 31, 1998 financial statements represented Keystone owned loans held for sale and loans receivable of approximately $579 million. FDIC Ex. 291 at 4. Approximately $548 million of the $579 million was ostensibly located at large loan servicing organizations. The loans serviced by Compu–Link and Advanta were recorded at $469.7 million, but this amount was fraudulently overstated by $431.8 million. Of this amount, $236 million in loans being serviced by Advanta were recorded as assets on Keystone's books, when in fact the loans were owned by United National Bank ("United"). The $236 million were loans that United was to have sold to Keystone for inclusion in the December 1998 securitization that Keystone abruptly cancelled. Carmichael, May 24, 2004, Tr. at 41; Hale Depo., August 27, 2002, 51–55, 138–39, 155–59 (FDIC Ex. 889); J. Wilson, May 21, 2004, Tr. at 23–27.

42. The confirmation process was primary and critical to the Keystone audit.

Buenger, June 2, 2004, Tr. at 131–32; Carmichael, May 24, 2004, Tr. at 46–47. Buenger was tasked with doing the confirmations. Buenger, June 2, 2004, Tr. at 6–23.

43. Professional skepticism is important in performing confirmation procedures, and evaluating the results of the confirmation procedures. Buenger, June 2, 2004, Tr. at 132; Carmichael, May 24, 2004, Tr. at 48; FDIC Exs. 439, 483 (AU 330.15).

44. Buenger had never worked on an audit of a bank involved in the securitization business before Keystone; she had no experience regarding the securitization business. Buenger, June 2, 2004, Tr. at 133–34.

45. The auditor's understanding of the client's arrangements and transactions with third parties is key to determining the information to be confirmed. The auditor should obtain an understanding of the substance of such arrangements and transactions to determine the appropriate information to include in the confirmation request. Buenger, June 2, 2004, Tr. at 134–35; Carmichael, May 24, 2004, Tr. at 54–55; FDIC Ex. 439 (AU 330.25); FDIC Ex. 483 (AU 330.15).

46. An understanding of the substance of the client's arrangements and transactions with third parties is an important factor in determining the information to be confirmed. Buenger, June 2, 2004, Tr. at 135; FDIC Ex. 436 at 133.

47. Buenger violated GAAS, including AU 330.25, by failing to obtain an adequate understanding of Keystone's arrangements and transactions with United, Compu–Link and Advanta. Carmichael, May 24, 2004, Tr. at 47–48, 52–56; Carmichael, May 25, 2004, Tr. at 18–21. Indeed, Buenger testified that she had no idea Keystone had a relationship with United. Buenger, June 2, 2004, Tr. at 135. Buenger did not investigate the details of that relationship, nor did she review or ask to review the written agreements between United and Keystone. Buenger knew little or nothing of the details concerning the Bank's relationship with United. Buenger, June 2, 2004, Tr. at 135–40.

## VI. Grant Thornton Failed to Confirm $85 Million in Loans that Were Allegedly in Transit

48. In order to conduct the audit in accordance with GAAS, Grant Thornton was required to confirm Keystone's loans in the manner prescribed by GAAS. Confirmation is the process of obtaining and evaluating a direct communication from a third party in response to a request for financial information about a particular item affecting financial statement assertions. Goldman, June 9, 2004, Tr. at 52–53. The confirmation response must come to the auditor directly from the third party, and must be in response to the auditor's confirmation request. Goldman, June 9, 2004, Tr. at 53–54.

49. According to Keystone's books, as of December 31, 1998, and the lead sheet of supposed Keystone-owned loans that Buenger was trying to confirm, the Bank owned $85 million in loans that were being serviced by Compu–Link, but were transferred to Advanta for servicing effective January 15, 1999. These loans were in fact non-existent. Neither Advanta nor Compu–Link ever confirmed to Buenger that the $85 million in loans existed, that the loans were owned by Keystone, or that servicing of the loans was transferred from Compu–Link to Advanta. Buenger did nothing to investigate this discrepancy, but improperly relied upon the dubious remittance statement that was given to her with the Forrest Krumm letter, discussed above. Buenger, June 2, 2004, Tr. at 66–67, 141–44; Quay, June 3, 2004, Tr. at 127–32; FDIC Ex. 500. Buenger failed to confirm the $85 million in loans in accor-

dance with GAAS. Goldman, June 9, 2004, Tr. at 52–57.

### VII. Grant Thornton's Failure with Respect To the Advanta Confirmation

50. The first confirmation response from Advanta was received by Grant Thornton on or about January 24, 1999, and went into a folder in the confirmation drawer in Grant Thornton's Cincinnati office. That confirmation showed only $6 million in loans owned by Keystone were being serviced by Advanta, rather than the $242 million in loans Keystone was reporting. Burke Depo., December 13, 2002, 16–21, 34–36, 129–30 (FDIC Ex. 898); Gunter Depo., December 20, 2002, 260–64 (FDIC Ex. 913); Carmichael, May 24, 2004, Tr. at 58–61; French Depo., November 19, 2002, 85–86 (FDIC Ex. 907); Ramirez Depo., September 26, 2002, 165–71, 197–98 (FDIC Ex. 896); FDIC Exs. 175, 176, 177, 255, 500.

51. Buenger did not know she had the first January confirmation response in the confirmation drawer, and on March 16, 1999, she asked Advanta to send another confirmation. Carmichael, May 24, 2004, Tr. at 61–62; FDIC Exs. 255, 500. On March 17, 1999, Buenger received another confirmation response from Advanta, which again showed only $6 million in loans owned by Keystone being serviced by Advanta. Burke Depo., December 13, 2002, 20–25, 32–36, 129–40 (FDIC Ex. 899); Gunter Depo., December 20, 2002, 260–64 (FDIC Ex. 913); Carmichael, May 24, 2004, Tr. at 61–62; FDIC Exs. 169, 176, 177, 257, 500.

52. Both Advanta confirmation responses identified Keystone as Investor 405. FDIC Exs. 176, 177, 500. Buenger never made any inquiry about what the investor numbers meant. She was not aware of the significance of the investor numbers. Buenger, June 2, 2004, Tr. at 66.

53. The "investor" is the owner. Buenger, June 2, 2004, Tr. at 152; Carmichael, May 24, 2004, Tr. at 63; Johnson, May 17, 2004, Tr. at 180. The number following "investor" identifies the owner of the loans. Investor 405 was Keystone and Investor 406 was United. Ramirez Depo., September 26, 2002, 141–42 (FDIC Ex. 896).

54. The independent auditor should be thorough in his or her search for evidential matter and unbiased in its evaluation. FDIC Ex. 480 (AU 326.25). A thorough and skeptical auditor would have determined what the investor numbers meant. Carmichael, May 25, 2004, Tr. at 65–66.

55. There was a $236 million discrepancy between the amount of Keystone-owned loans Advanta confirmed it was servicing in its two confirmation responses and what Keystone's books said. Carmichael, May 24, 2004, Tr. at 61; French Depo., November 19, 2002, 87–92 (FDIC Ex. 907); FDIC Exs. 176, 177, 235, 379, 500.

56. Buenger reviewed the second Advanta confirmation response on or about March 17, 1999. Buenger, June 2, 2004, Tr. at 155; FDIC Exs. 169, 176, 177, 500. Buenger did not notify Keystone's management, the OCC, or even Quay of the $236 million discrepancy. Buenger testified it kind of got put on the "backburner." Buenger, June 2, 2004, Tr. at 155–57; Goldman, June 9, 2004, Tr. at 58; Carmichael, May 24, 2004, Tr. at 61–62.

57. Buenger can't tell what she was doing during the 91 hours she billed to Keystone during the last two weeks of March, 1999 that was more important than resolving the $236 million discrepancy issue with Advanta. Buenger, June 2, 2004, Tr. at 156–57; FDIC Ex. 210.

58. Buenger's failure to pursue the $236 million discrepancy was a violation of GAAS. If Buenger had followed GAAS and

promptly investigated the $236 million discrepancy, she would have discovered the fraud, which would have led to the closure of the Bank. Budnick, May 18, 2004, Tr. at 122, 138–39, 145–46; Carmichael, May 24, 2004, Tr. at 30–31, 41–42, 66–69; Carmichael, May 25, 2004, Tr. at 30–31; Gibson, May 20, 2004, Tr. at 35–37, 59; Johnson, May 17, 2004, Tr. at 148; Kaufman, May 18, 2004, Tr. at 205–07; C. Wilson, May 17, 2004, Tr. at 240. Buenger's evaluation and investigation of the Advanta confirmation response demonstrated a lack of professional skepticism and due care. Her actions were an extreme departure from GAAS. Carmichael, May 24, 2004, Tr. at 68–69.

59. Quay saw and initialed the Advanta confirmation response on March 23, 1999. Quay, June 3, 2004, Tr. at 133–34; FDIC Exs. 169, 176, 177, 500.

60. On April 7, 1999, Buenger called Patricia Ramirez, the Investor Reporting Manager for Advanta, and talked with her for three minutes. The word "United" was not used during the Buenger–Ramirez conversation. Buenger, June 2, 2004, Tr. at 67; Gunter Depo., December 20, 2002, 269–74 (FDIC Ex. 913); Ramirez Depo., September 26, 2002, 182–83 (FDIC Ex. 896); FDIC Ex. 282.

61. On April 7, 1999, one minute after the phone call between Buenger and Ramirez concluded, Ramirez sent an e-mail to Buenger reflecting that United, Investor No. 406, owned $236 million in loans being serviced by Advanta. The e-mail does not reflect that the $236 million in loans are owned by Keystone. Gunter Depo., December 20, 2002, 269–74, 294–95 (FDIC Ex. 913); Carmichael, May 24, 2004, Tr. at 70; FDIC Exs. 169, 500. There is nothing in Keystone's records reflecting that Keystone owned loans under Investor No. 406, or under the name United National Bank, and there is nothing in the e-mail reflecting the $236 million in loans are owned by

Keystone. Goldman, June 9, 2004, Tr. at 59–61.

62. All of the documentary information provided by Advanta to Grant Thornton was true and accurate. Buenger, June 2, 2004, Tr. at 162; Carmichael, May 25, 2004, Tr. at 144–45; Goldman, June 9, 2004, Tr. at 75; Johnson, May 17, 2004, Tr. at 179–81; C. Wilson, May 18, 2004, Tr. at 62–63. That information showed that United, not Keystone, owned the $236 million in loans, and the inevitable conclusion from that is that Keystone's financial statements were materially misstated as a result of fraud. Carmichael, May 24, 2004, Tr. at 72–73; Johnson, May 17, 2004, Tr. at 121–26; FDIC Exs. 169, 178, 379, 500.

63. Buenger violated GAAS by failing to carefully evaluate and investigate the Advanta confirmation responses—especially the e-mail from Ramirez. If Buenger had followed GAAS, she would have found the fraud on April 7, 1999, and the Bank would have been closed in April, 1999. Budnick, May 18, 2004, Tr. at 122; Carney, May 19, 2004, Tr. at 101; Carmichael, May 24, 2004, Tr. at 30–31, 79; Carmichael, May 25, 2004, Tr. at 30–31; Gibson, May 20, 2004, Tr. at 34–37; Johnson, May 17, 2004, Tr. at 148; C. Wilson, May 17, 2004, Tr. at 240.

64. To comply with GAAS's requirements of professional skepticism, Buenger should have called Ramirez back after receipt of the e-mail to determine why the e-mail reflected that the loans were owned by United and requested that Ramirez confirm in writing that the $236 million in loans were owned by Keystone. Carmichael, May 24, 2004, Tr. at 70–71, 75–76; Carmichael, May 25, 2004, Tr. at 21–22; Quay, June 3, 2004, Tr. at 135–39. Buenger failed to take either step; in fact, she never spoke with Ramirez again after receipt of the e-mail. Buenger, June 2, 2004,

Tr. at 66–69; Goldman, June 9, 2004, Tr. at 62.

65. In any event, the court does not believe Buenger's testimony about the telephone call with Ramirez for the following reasons. First and most importantly, the physical evidence, i.e., the email, contradicts Buenger's account of the phone call. According to Buenger, Ramirez told her "[t]hese belonged to Keystone at 12/31/98." Buenger, June 2, 2004, Tr. at 28. However, one minute later, Ramirez sent Buenger an email which stated:

"Below is the information requested from investor 406 as of 12/31/98. Investor number 406, investor name United National Bank, number of loans, 6,283, month end balances $236,221,923.07."

FDIC Exs. 754, 777. Ramirez's email is completely at odds with the statements Buenger attributes to her. For this reason alone, Buenger's testimony on this point is not credible.

66. Second, Joey Johnson, an OCC examiner, testified that, on August 25, 1999, he and other OCC examiners met with Grant Thornton to apprise them of the OCC's discovery of major discrepancies in the loan balances serviced by Compu–Link and Advanta. Johnson, May 17, 2004, Tr. at 112; FDIC Ex. 379. At that meeting, Stan Quay told the OCC they had confirmed those balances for the year ended 1998 and they all reconciled. Johnson, May 17, 2004, Tr. at 112; FDIC Ex. 379. Thereafter, Grant Thornton retrieved copies of the confirmations and the confirmation requests from their Cincinnati office. Johnson, May 17, 2004, Tr. at 112; FDIC Exs. 379, 754, 755. According to Johnson, the examiners questioned Buenger about why she added the $236 million owned by United to the $6 million owned by Keystone. Johnson, May 17, 2004, Tr. at 125; FDIC Ex. 379. Buenger stated that code 406 loans were under a "bad name" and should have been included in the con-

firmed loans. Johnson, May 17, 2004, Tr. at 126; FDIC Ex. 379. Buenger did not tell the OCC that Ramirez had told her that the United loans were Keystone loans. Johnson, May 17, 2004, Tr. at 126. Nor did she offer FDIC Exhibit 281, her handwritten note of what Ramirez purportedly told her, to the OCC. Indeed, Grant Thornton never offered Exhibit 281 to the OCC while the Bank was still open. Johnson, May 17, 2004, Tr. at 127–28. The court found Johnson to be completely credible. Furthermore, the failure of Grant Thornton to produce Exhibit 281 to the OCC undermines Buenger's credibility regarding what Ramirez supposedly told her.

67. Third, during her testimony, Ramirez was clear that she was absolutely certain regarding ownership of the loans under investor codes 405 and 406. Putting aside the purportedly speculative testimony, Ramirez testified that she had never been confused regarding the ownership of the loans. Ramirez Depo., September 26, 2002, 143 (FDIC Ex. 896). The court found Ramirez to be a totally credible witness. Indeed, her credibility was strengthened by her candor in explaining that she didn't have a specific recollection of her conversation with Buenger.

68. Fourth, as to certain points, Buenger's testimony regarding scrutiny of her confirmation process during the last week of the Bank's existence and what she did was contradicted by Michael Gibson and Gary Ellis, both of whom the court found to be completely credible.

69. Finally, the demeanor of Buenger on the witness stand, when taken together with her interests in the case, leads the court to believe she was not entirely truthful.

70. During the trial, Grant Thornton filed a motion to exclude the speculative testimony of Patricia Ramirez. By Order entered September 29, 2005, that motion

was denied. The court's findings regarding the phone call between Buenger and Ramirez do not depend on the purportedly speculative testimony. However, for the following reasons, the court denied the motion to exclude it.

71. Ramirez testified via video deposition. The disputed portion of her testimony concerns a conversation she had with Susan Buenger on April 7, 1999. Buenger testified that Ramirez told her "[the United loans] belonged to Keystone at 12/31/98." Buenger, June 2, 2004, Tr. at 28. Ramirez testified that, although she has no specific recollection of the conversation with Buenger, she never would have made the remarks Buenger has attributed to her.

72. At the outset, the court notes that much of the deposition testimony that Grant Thornton argues is speculative is not, in fact, speculative. *See e.g.,* Ramirez Depo., September 26, 2002, 186 (FDIC Ex. 896) (Q: Is there any possibility that you told Susan Buenger that the United loans were actually Keystone loans? A: No. Q: How do you know? A: Because I know who owned the loans. 405 did not belong to 406.). To borrow the FDIC's analogy, someone might ask me whether I have ever introduced myself as Abraham Lincoln and, although I cannot recall the details of every conversation I have ever had, I could answer that question under oath in the negative without speculating.

73. As to the speculative testimony, Federal Rule of Evidence 406 provides:
> Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

74. According to the Fourth Circuit, in determining whether examples of specific conduct of a party are numerous enough and sufficiently regular to be admissible as evidence of a pattern of conduct or habit, the key criteria are adequacy of sampling and uniformity of response or ratio of reactions to situations. *Wilson v. Volkswagen of America, Inc.,* 561 F.2d 494, 511 (4th Cir.1977).

75. The evidence in this case showed that Advanta was in the business of servicing loans. Investor reporting and responding to confirmation requests were so commonplace that Advanta had an entire department dedicated to those tasks, and Patricia Ramirez was the manager of that department. At the time period in question, Daniel Burke worked in the investor reporting department at Advanta and had primary responsibility for Keystone's loans. Burke testified that when a confirmation request was received, "you'd pull the file, get the information, give it to the supervisor or manager to verify and then send it to them." Burke Depo., December 13, 2002, 9 (FDIC Ex. 898). Burke further testified that the supervisor reviewed the information before it was sent to the requesting party to make sure the information was correct. Burke Depo., December 13, 2002, 17 (FDIC Ex. 898). He testified that Advanta responded to confirmation requests from auditors "numerous times." Burke Depo., December 13, 2002, 17 (FDIC Ex. 898). He responded to two confirmation requests from Grant Thornton regarding Keystone's loans, one in January of 1999 and the other in March of 1999. Both of these responses were correct, indicating that Advanta was servicing approximately $6 million dollars worth of loans on Keystone's behalf. Burke testified that in the four or five years he worked with Ramirez she never confused one investor with another investor. Burke Depo., December 13, 2002, 28–29 (FDIC Ex. 899). Ramirez herself testified that she had never made a mistake concerning

investor numbers. Ramirez Depo., September 26, 2002, 189 (FDIC Ex. 896); *see also* Romero Depo., September 25, 2002, 109–10 (FDIC Ex. 905) ("[T]here's no doubt in our minds, the investor number is such an integral part of how we service loans, it's the thing that drives where payments go, where remittances go. There's no question of that ever being inaccurate.").

76. Ramirez' unequivocal testimony was that the loans boarded in Investor No. 406 belonged to United National Bank.

Q: And as of December 16, 1998, who did you understand to own the loans boarded in Investor No. 406?

A: United National Bank.

Q: And to whom did you authorize information access for Investor No. 406?

A: United National Bank.

Q: Now, do you recall ever becoming confused about who owned the loans in Investor No. 406?

A: No.

Q: Do you ever recall having any doubt that it was United National Bank that owned the loans in Investor No. 406?

A: No.

\* \* \*

Q: Please—

A: That's who we reported and remitted to.

Q: And the reporting and remitting you did to United National Bank was something you did as part of your job?

A: Correct.

Q: How familiar are you with investor numbers.

A: Very familiar. Everything runs off of investor numbers.

Ramirez Depo., September 26, 2002, 142–43 (FDIC Ex. 896). Her responses in this regard were not speculative. Ramirez further testified that, in sending the email, she specifically "felt like I had to make sure that I identified the information being provided was not Keystone's but was United's." Ramirez Depo., September 26, 2002, 175 (FDIC Ex. 896).

77. Upon further questioning, Ramirez testified:

Q: Now, if Ms. Buenger had asked you, if she said, "I'm looking for 244 million in loans that Advanta is servicing on behalf of Keystone," what would you have said?

A: I would have told her what the total amount of loans were being serviced for Keystone did not equal what she was looking for.

Q: If she said, "Hey, I think what I should do is add up Investor 405 and 406," what would you say?

A: I would have said that would have been incorrect.

Q: If she gave you any indication that she intended to sum the unpaid principal balance in Investor Nos. 405 and 406 to arrive at the loans serviced by Advanta on behalf of Keystone, what would you have said?

A: I would have told her it was wrong.

Q: If she had hit the reply button on the e-mail and said to you, "What the heck is United," in response to your e-mail, "Tell me what United is and why you're sending me United when I'm trying to confirm Keystone loans," what would you have written back in response to that reply?

A: I would have said that Investor 406—or United National Bank was

the owner of the loans in Investor 406.

Ramirez Depo., September 26, 2002, 179–80 (FDIC Ex. 896). The court believes that the foregoing testimony is admissible under F.R.E. 406 for the reasons cited above. However, out of an abundance of caution, the court has disregarded this and any other arguably speculative testimony by Ramirez in making its findings and conclusions.

78. The Court finds that Ramirez did not state to Buenger that "the loans coded under the United name actually belonged to Keystone as of December 31, 1998," as reflected in Buenger's handwritten note. Buenger, June 2, 2004, Tr. at 67, Gunter Depo., December 20, 2002, 269–74 (FDIC Ex. 913); Carmichael, May 24, 2004, Tr. at 69–70; Ramirez Depo., September 26, 2002, 143–45; 179–80, 185–89, 192–93, 196, 198–200, 222, 247–49 (FDIC Ex. 896). Ramirez clearly knew that United owned the $236 million in loans, as she worked with United with respect to the loans on a regular basis, repeatedly provided United with documentation of its ownership of the loans and never demonstrated any confusion about who owned the loans. Ramirez Depo., September 26, 2002, 143–45; 179–80, 185–89, 192–93, 196, 198–200, 222, 247–49 (FDIC Ex. 896); J. Wilson, May 21, 2004, Tr. at 27. Moreover, if Ramirez had made such a statement, GAAS would require that Buenger obtain written confirmation of such a significant fact, in order to avoid a swearing match over what was said. Carmichael, May 24, 2004, Tr. at 71–73, 81–82; Goldman, June 9, 2004, Tr. at 69, 72–73. The auditing standards require an auditor to obtain the best evidence they can within the time constraints and money constraints set on them. Goldman, June 9, 2004, Tr. at 71. A written confirmation is the highest form of evidential matter an auditor can receive. Goldman, June 9, 2004, Tr. at 71. There were no time or money constraints that would prevent

Buenger from obtaining the best evidence—a written confirmation from Ramirez that Keystone owned the loans. Goldman, June 9, 2004, Tr. at 72–73. Oral confirmations should be documented in the workpapers. If the information in the oral confirmation is significant, the auditor should request the parties involved to submit written confirmation of the specific information directly to the auditor. As previously stated, Buenger failed to obtain any such written confirmation. Carmichael, May 24, 2004, Tr. at 71–73, 81–82; Goldman, June 9, 2004, Tr. at 54–55; FDIC Ex. 439 (AU 330.29).

79. The $236 million exception was a significant auditing question, but Quay was not involved in evaluating its significance. Carmichael, May 24, 2004, Tr. at 77–78.

80. The auditor with final responsibility for the audit should direct assistants to bring to his attention significant accounting and auditing questions raised during the audit so that he may assess their significance. GT Ex. 267 (AU 311.12). Quay violated GAAS by failing to supervise or participate in the evaluation of the Advanta confirmation responses. Carmichael, May 24, 2004, Tr. at 56–58, 77–79; FDIC Exs. 709, 710.

## VIII. Grant Thornton Issues its Audit Report

81. On March 24 and 25, 1999, Quay presented several members and prospective members of Keystone's board and Keystone's shareholders with draft copies of Keystone's December 31, 1998 financial statements and told them that Keystone was going to get a clean opinion on its financial statements. Budnick, May 18, 2004, Tr. at 122–30; G. Ellis, May 22, 2004, Tr. at 13–14, 46; Gibson, May 20, 2004, Tr. at 54–56; Kaufman, May 18, 2004, Tr. at 198–99, 219–20; Quay, June 4, 2004, Tr. at 74–77, 84–85; FDIC Exs. 263, 882. At the shareholders meeting the next day, Quay

also distributed copies of Keystone's financial statements. G. Ellis, May 22, 2004, Tr. at 14–15; Kaufman, May 18, 2004, Tr. at 199–200; Quay, June 4, 2004, Tr. at 78–79, 106–09; FDIC Ex. 172. Neither Quay nor Buenger made any disclosure to the Board or shareholders of the $236 million discrepancy that Buenger had discovered. Budnick, May 18, 2004, Tr. at 128–29; Carmichael, May 24, 2004, Tr. at 64; Quay, June 4, 2004, Tr. at 78, 80. Quay violated GAAS by making statements to Keystone's directors, prospective directors, and officers that Keystone was going to receive a "clean opinion" on its financial statements when he had no reasonable basis for making such statements. Carmichael, May 25, 2004, Tr. at 27–28, 175.

82. On April 19, 1999, Grant Thornton issued and delivered to Keystone's board its audit report stating that Keystone's financial statements were fairly stated in accordance with GAAP, and reflecting a shareholder's equity of $184 million. Budnick, May 18, 2004, Tr. at 131–33; G. Ellis, May 22, 2004, Tr. at 23–24, 48–50; Ellis Ex. 4; FDIC Exs. 291, 621. In fact, Keystone was insolvent as of year-end, 1998. Carmichael, May 24, 2004, Tr. at 41. The audited financial statements provided by Quay to the board on April 19, 1999, were substantially the same as the financial statements Quay had provided board members and shareholders in March, 1999. Budnick, May 18, 2004, Tr. at 136–37; Kaufman, May 18, 2004, Tr. at 203–05; FDIC Exs. 291, 296. Grant Thornton's audit report violated GAAS by offering a "clean opinion" on Keystone's financial statements without having adequate evidence to support that opinion and having substantial evidence that contradicted the opinion. Carmichael, May 24, 2004, Tr. at 75; Carmichael, May 25, 2004, Tr. at 28–30.

83. Because Keystone's financial statements reflected ownership of more than $500 million in loans that were not in fact owned by Keystone, the financial statements were materially misstated. Quay, June 4, 2004, Tr. at 88.

84. Grant Thornton represented to Keystone's board that it had encountered no significant difficulties in performing the year-end, 1998 audit. FDIC Ex. 296.

85. Keystone's board of directors and Gary Ellis reasonably relied on Grant Thornton's report. The report led Keystone's board to believe that the Bank was in good financial condition. Based on Grant Thornton's report, Keystone's board continued to declare dividends and operate the Bank. If Grant Thornton had exercised due professional care in connection with its audit, the fraud would have been discovered. If Grant Thornton had disclosed to Keystone's board or the OCC the fact that Keystone was carrying over $400 million in loans on its books that were not owned by Keystone, the Bank would have been closed by April 21, 1999. Budnick, May 18, 2004, Tr. at 122, 138–39, 145–46; G. Ellis, May 22, 2004, Tr. at 55; Gibson, May 20, 2004, Tr. at 35–37, 59; Johnson, May 17, 2004, Tr. at 148; Kaufman, May 18, 2004, Tr. at 205–07; Potter, May 27, 2004, Tr. at 14; Quay, June 4, 2004, Tr. at 74–76; C. Wilson, May 17, 2004, Tr. at 240; FDIC Ex. 341.

### IX. Gary Ellis Becomes President of Keystone

86. In 1984, Gary Ellis was President of the Bank of Dunbar. The Bank of Dunbar was later merged into United Bank at which time Ellis joined the management team at United, eventually becoming its President. J. Wilson, May 21, 2004, Tr. at 44–46.

87. From the time of the merger with the Bank of Dunbar until the time Ellis left United, United more than doubled in size. Ellis was instrumental in the growth

of United. J. Wilson, May 21, 2004, Tr. at 47.

88. In 1998, United National Bank merged with George Mason Bankshares of Virginia. G. Ellis, May 22, 2004, Tr. at 9. In the spring of 1999, following the merger, Ellis voluntarily began looking for employment outside United. G. Ellis, May 22, 2004, Tr. at 10. Ellis had dealt with Keystone in the past, and on March 19, 1999, Billie Cherry, Chairman of Keystone's board, invited Ellis to attend Keystone's annual shareholders meeting on March 25, 1999. G. Ellis, May 22, 2004, Tr. at 10–13. During that call, Cherry suggested that Ellis should consider becoming president of Keystone. G. Ellis, May 22, 2004, Tr. at 10–13.

89. Ellis was not fired or told to leave United, had no deadline for leaving United, and could have remained at United rather than leaving for the Keystone position. G. Ellis, May 22, 2004, Tr. at 9–10.

90. In late March 1999, Ellis visited Keystone and discussed with Keystone directors Gibson, Budnick, Kaufman and Church his potential employment as president of the Bank. Gibson received "pretty glowing recommendations" about Ellis. Gibson, May 20, 2004, Tr. at 85. Ellis received a rolling two-year contract at $375,000 per year with benefits. G. Ellis, May 22, 2004, Tr. at 33–36; Gibson, May 20, 2004, Tr. at 90. The contract discussions included compensation for board meetings and committee meetings. G. Ellis, May 22, 2004, Tr. at 34; Gibson, May 20, 2004, Tr. at 90. The total value of the final contract between Ellis and Keystone was approximately $460,000 to $470,000 per year. L. Ellis, May 26, 2004, Tr. at 16, 21; Ellis Ex. 9.

91. Doing his due diligence before accepting a position, Ellis attended Keystone's board meeting on March 24 and annual shareholders meeting on March 25, 1999. G. Ellis, May 22, 2004, Tr. at 13–18;

Gibson, May 20, 2004, Tr. at 82–82; FDIC Ex. 263. At both meetings, Quay passed out copies of the financial statements Grant Thornton was auditing for Keystone. G. Ellis, May 22, 2004, Tr. at 14–15. Quay also told Ellis and other members of the board that Grant Thornton was going to give Keystone a clean audit opinion for 1998. Budnick, May 18, 2004, Tr. at 122–30; G. Ellis, May 22, 2004, Tr. at 46; Gibson, May 20, 2004, Tr. at 54–56; Kaufman, May 18, 2004, Tr. at 198–99, 219–20.

92. Ellis visited Keystone again, on or about March 30, and Quay offered similar assurances at that time. G. Ellis, May 22, 2004, Tr. at 16–17.

93. Ellis relied on the financial statements Quay gave him, and Quay's oral representations to Ellis and others that Keystone was going to get a clean audit opinion. G. Ellis, May 22, 2004, Tr. at 15–16, 55. On April 2, 1999, Ellis met with his attorneys to draft a proposed employment agreement with Keystone. G. Ellis, May 22, 2004, Tr. at 18. During the first two weeks of April 1999, Ellis met with Church and Cherry regarding their expectations for him. G. Ellis, May 22, 2004, Tr. at 20. It was decided that Ellis would be responsible for the "banking" business at Keystone as opposed to the mortgage loan securitizations. G. Ellis, May 22, 2004, Tr. at 20; Ellis Ex. 9.

94. On April 19, 1999, at a Keystone board meeting, Ellis reviewed Grant Thornton's final audit report on Keystone for 1998, and that report showed that Grant Thornton gave Keystone a clean opinion. G. Ellis, May 22, 2004, Tr. at 23–27; Ellis Ex. 4. The Board voted to approve Ellis' hiring as president of Keystone, subject to the signing of a contract and approval by the OCC. G. Ellis, May 22, 2004, Tr. at 28–29. Ellis resigned from United by letter dated April 20, 1999. G.

Ellis, May 22, 2004, Tr. at 92–93; Ellis Ex. 7.

95. Ellis' employment contract was signed on April 26, 1999. G. Ellis, May 22, 2004, Tr. at 29.

96. Quay intended and knew that Ellis would rely on his statements, and Ellis did, in fact, rely on them. Quay, June 4, 2004, Tr. at 74–88; G. Ellis, May 22, 2004, Tr. at 15–16, 55; Ellis Ex. 4.

### X. The OCC Discovers the Fraud and the Bank is Closed

97. In 1999, an examination of Keystone was conducted by a team of OCC examiners. Johnson, May 17, 2004, Tr. at 102–03; C. Wilson, May 17, 2004, Tr. at 193. The examination began on site in late June/early July of 1999. Johnson, May 17, 2004, Tr. at 103; C. Wilson, May 17, 2004, Tr. at 193. Members of the exam team included Joey Johnson, Cindy Wilson, and Mark Blair. Johnson, May 17, 2004, Tr. at 102–03; C. Wilson, May 17, 2004, Tr. at 193. Blair was the examiner in charge of the examination. C. Wilson, May 17, 2004, Tr. at 193.

98. Throughout the examination, the bank examiners had difficulty obtaining accurate records from the servicers. Johnson, May 17, 2004, Tr. at 105. They were informed in late July or early August by Church and Ellis that the Bank did not want the examiners to contact the servicers directly. C. Wilson, May 18, 2004, Tr. at 21; FDIC Ex. 353.

99. Church and Graham made several efforts to have Advanta and Compu–Link respond to the OCC with information on loans owned by United as well as Keystone, in order to keep the fraud concealed. Romero Depo., September 25, 2002, 266–67 (FDIC Ex. 905); C. Wilson, May 17, 2004, Tr. at 217–23; FDIC Exs. 365, 367, 369, 373, 374, 413.

100. On August 5, 1999, examiners met with Church, Graham, and Cherry and indicated they wanted to contact the servicers directly to obtain accurate information. C. Wilson, May 18, 2004, Tr. at 22, 213; FDIC Ex. 354. Church, Graham, and Cherry became irate and insisted that such contacts would damage the Bank's reputation. C. Wilson, May 18, 2004, Tr. at 22, 213–15.

101. In early August, bank examiners learned that Keystone had the ability to manipulate servicer data and servicer reports that, while appearing to come directly from the servicers, were actually prepared by the Bank. C. Wilson, May 18, 2004, Tr. at 42–44; Blair, June 4, 2004, Tr. at 164–65. As a result, examiners sent by registered or certified mail, on August 6, 1999, requests directly to Compu–Link and Advanta for information on Keystone loans. C. Wilson, May 17, 2004, Tr. at 215–17; C. Wilson, May 18, 2004, Tr. at 45; FDIC Exs. 350, 351.

102. On Monday, August 23, 1999, the examiners, incident to their examination of the Bank, contacted the Bank's loan servicers by phone to determine the balances of loans actually owned by Keystone. Johnson, May 17, 2004, Tr. at 106–07; C. Wilson, May 17, 2004, Tr. at 224–25; FDIC Exs. 369, 408. During that week, Joey Johnson spoke by telephone with Beverly Reck, an employee of Compu–Link, one of the servicers, and was told by Reck that Compu–Link was boarding $31 million in Keystone Loans. Johnson, May 17, 2004, Tr. at 106; FDIC Ex. 408.

103. Blair and Wilson contacted Advanta and learned that Advanta was only servicing approximately $6 million in Keystone loans, far less than the approximately $242 million that Keystone was reporting. C. Wilson, May 17, 2004, Tr. at 233; Johnson, May 17, 2004, Tr. at 122–26; FDIC Exs. 408, 413, 379.

104. These contacts with Compu–Link and Advanta led the examiners to quickly

conclude that the Bank's books overstated loans it owned by approximately $515 million. C. Wilson, May 17, 2004, Tr. at 230.

105. On Wednesday, August 25, 1999, Blair, SS Analyst Kathy Gerardy and Johnson met with Ellis and Quay to obtain an explanation for the discrepancy between the servicers' records and the Bank's records. Johnson, May 17, 2004, Tr. at 112; FDIC Ex. 379. Church joined the meeting after it began. Johnson, May 17, 2004, Tr. at 112; FDIC Ex. 379. Church and Quay were informed that the examiners' direct contacts with the servicers indicated the Bank was reporting over $500 million in loans boarded at the two servicers that were not shown on the servicers' records. Johnson, May 17, 2004, Tr. at 112; FDIC Ex. 379. Church insisted the Bank owned the $500 million of loans in question and stated she had no idea why the records showed a difference. FDIC Ex. 379. Quay repeatedly asserted that the numbers had been reconciled and confirmed by Grant Thornton auditors at year-end 1998. Johnson, May 17, 2004, Tr. at 117; FDIC Ex. 379. The examiners told Quay and Church that the Bank would have to provide proof that it owned the entire balance of loans it claimed. FDIC Ex. 379.

106. Quay left the meeting and told Buenger to have the confirmations faxed to the Bank, which Buenger did. Buenger, June 2, 2004, Tr. at 162–64. Buenger called Dale Schaffer in Grant Thornton's Cincinnati office, and told him to fax the servicer confirmation workpapers to her. Buenger, June 2, 2004, Tr. at 164–65. She reviewed the fax to make sure Schaffer had sent her what she wanted. Buenger, June 2, 2004, Tr. at 167.

107. Quay and Buenger represented to the OCC that the fax contained the confirmations Buenger received in connection with her audit fieldwork. Buenger, June 2, 2004, Tr. at 167–68; Johnson, May 17, 2004, Tr. at 117–19.

108. Later, Quay provided copies of confirmation requests that were prepared and signed by Church and printed on Bank letterhead, but mailed from Grant Thornton's office. Johnson, May 17, 2004, Tr. at 117–19; FDIC Exs. 379, 754, 755.

109. The Advanta confirmation was initialed "S.B. 3/17/99" and "S.J.Q. 3/23/29." FDIC Ex. 754. The initials were identified as those of Susan Buenger and Stanley Quay. The response from Advanta showed an ending balance as of 12/31/98 of $6,342,110.34 for investor number 405, Keystone Bank, and a balance of $236,221,923.07 for investor number 406, United National Bank. FDIC Ex. 754. The two numbers had been added together by Buenger in a handwritten notation at the bottom of the response to produce a total of $242,564,033.41. FDIC Ex. 754. Johnson described this as a "forced reconciliation" to arrive at the total the Bank was reporting for Advanta-serviced loans the Bank owned with no basis to support adding the two numbers together. Johnson, May 17, 2004, Tr. at 124–25.

110. On or about August 25, 1999, Buenger was asked by the examiners to explain why she had added together the two numbers provided by Advanta in its response to the confirmation request. Johnson, May 17, 2004, Tr. at 125, 137–38; FDIC Ex. 379. Buenger stated that the loans coded 406 were under a "bad name" and should have been included in the total of loans owned by Keystone. Johnson, May 17, 2004, Tr. at 126, 138; FDIC Ex. 379. At that time, Buenger did not provide any evidence that she did anything further to verify the Bank's claim that it owned all the loans. Johnson, May 17, 2004, Tr. at 126–28, 138. She did not assert at that time, as she did later, that Patricia Ramirez of Advanta had told her

the loans coded as United Loans were actually owned by Keystone, nor did she offer, or refer to, a handwritten note produced later that read: "Per discussion with Patricia Ramirez at (619) 674–3876, the loans coded under the 'United' name actually belonged to Keystone as of December 31, 1998." Johnson, May 17, 2004, Tr. at 126. Buenger admitted the note was important evidence of her confirmation work. Buenger, June 2, 2004, Tr. at 169. The documents in the fax Buenger gave to the OCC show that Keystone owned $6 million in loans and that United owned $236 million in loans being serviced by Advanta. FDIC Exs. 408, 754.

111. The only written confirmations Grant Thornton ever received with regard to the loans serviced by Advanta showed that $236 million of the loans carried on Keystone's books were actually owned by United. Johnson, May 17, 2004, Tr. at 179–81; Carmichael, May 24, 2004, Tr. at 68–69, 73, 82; FDIC Ex. 754. Even if Buenger had received an oral confirmation from Ramirez at Advanta that Keystone, and not United, was the owner of these loans, under GAAS, Buenger was obligated to obtain written confirmations. Carmichael, May 24, 2004, Tr. at 70–71; FDIC Ex. 485. According to GAAS, if information in an oral confirmation is significant, the auditor cannot rely on the oral confirmation, but must obtain the confirmation from the servicer in writing. Carmichael, May 24, 2004, Tr. at 71–72; FDIC Ex. 485. The $236 million at issue here was significant since it constituted about one-fourth of the Bank's claimed assets. Carmichael, May 24, 2004, Tr. at 71–72. Therefore, Buenger and Grant Thornton were negligent in their failure to obtain written confirmation from Advanta of what Buenger asserts Ramirez told her over the telephone. Carmichael, May 24, 2004, Tr. at 68–73.

112. On or after August 25, 1999, Buenger made changes to her workpapers. Buenger, June 2, 2004, Tr. at 53–55. Initially, she did not admit this fact in her deposition, but when confronted with the evidence, she admitted that she had changed her workpapers. Buenger, June 2, 2004, Tr. at 170–71; FDIC Ex. 500. The e-mail from Ramirez to Buenger, dated April 7, 1999, is initialed by Buenger on March 17, 1999 and by Quay on March 23, 1999, dates which on their face are not correct. Johnson, May 17, 2004, Tr. at 127–29; FDIC Ex. 754 at p. 17.

113. When informed on August 26, 1999, that some $500 million in loans were missing, Quay stated finding the loans would not be a problem, they could simply trace the interest payments back to the mortgages they represented. Kaufman, May 18, 2004, Tr. at 216–17. Quay attempted to do this, but after about 45 minutes was not successful. Kaufman, May 18, 2004, Tr. at 217. Quay had indicated that if actual cash receipts in respect of debt service on the loans could be located, the loans were probably real and belonged to Keystone. Budnick, May 18, 2004, Tr. at 148. Similarly, the absence of cash receipts would be a strong indicator that the loans did not exist. Budnick, May 18, 2004, Tr. at 148.

114. On August 26, 1999, Quay called Patricia Ramirez and contended that Keystone owned $242 million in loans serviced by Advanta. Ramirez told Quay that he was wrong, that Keystone only owned $6 million in loans being serviced by Advanta, and that she had never confirmed a larger number to Grant Thornton, which was true. Ramirez Depo., September 26, 2002, 201–06 (FDIC Ex. 896).

115. Also on August 26, 1999, Quay called Lynn Ellen ("Dee") Romero, a client support specialist for Advanta. She also told Quay that Advanta was servicing only

$6 million in loans owned by Keystone. Quay said that Advanta was sending millions of dollars to Keystone every month. Romero tried to straighten Quay out on these issues, but he resisted straightening. Romero Depo., September 25, 2002, 99–109, 269–71 (FDIC Ex. 905).

116. On or about August 26, 1999, Quay and Buenger checked the remittances received by Keystone from Compu–Link and Advanta during 1999. They were unable to find evidence of income to support Keystone's ownership of over $500 million in loans being serviced by Compu–Link and Advanta, nor could they find evidence to support Keystone's reported interest income for 1999. Budnick, May 18, 2004, Tr. at 148–49; Buenger, June 2, 2004, Tr. at 172–73; Kaufman, May 18, 2004, Tr. at 217–18; Quay, June 3, 2004, Tr. at 155–56.

117. After their August 25, 1999 meeting, efforts were made by Bank management, the external auditors and the examiners to locate the missing loans. As part of these efforts, Johnson prepared a calculation of interest received by Keystone that quickly showed the Bank to be receiving far less in interest income than it should have received on the number of loans it claimed to own. Johnson, May 17, 2004, Tr. at 142–43, 185–87.

118. At the regular meeting of the Bank's board of directors on August 26, 1999, Ann Jaedicke, Kathy Gerardy and Blair of the OCC and Prosser of the FDIC advised the board that they had contacted two of the Bank's servicers, Advanta and Compu–Link, and learned that $515 million of loans the Bank had booked as owned were not in fact owned by the Bank. Gibson, May 20, 2004, Tr. at 70–71.

119. On August 26, 1999, examiners gave the Bank's board of directors notice that they had until the close of business on Monday, August 30, to account for the discrepancy. FDIC 408. In the mean-time, the examiners themselves proceeded to visit the offices of the servicers to examine relevant records. FDIC 408.

120. After the August 26, 1999 meeting, Gibson heard Quay questioning Buenger about the confirmation of the loans. Gibson, May 20, 2004, Tr. at 80–81. When Buenger revealed that she had relied on a phone call to confirm the Advanta loans, Quay got angry with Buenger and criticized her for relying on a phone call and failing to follow up in writing. Gibson, May 20, 2004, Tr. at 80–81.

121. On Friday, August 27, 1999, Johnson traveled to Compu–Link headquarters in Lansing, Michigan, accompanied by FDIC examiners Phil Yannick and Mike Pisano. Johnson, May 17, 2004, Tr. at 152, 174; FDIC Ex. 408. The three examiners met with CFO Reck and MIS manager Dan Pearson of Compu–Link and were provided copies of trial balances and remittance records for the universe of loans owned by Keystone and those held in trust for Keystone securitizations and owned by other institutions. FDIC Ex. 408. The examiners also examined copies of reports routinely provided to the Bank by Compu–Link. FDIC Ex. 408. Reck and Pearson explained how Compu–Link identified loans held by Keystone and how it identified loans in securitizations owned by other institutions. FDIC Ex. 408. Reck also provided copies of remittance checks sent to Keystone since October, 1998. Johnson, May 17, 2004, Tr. at 188; FDIC Ex. 408. It was clear to the examiners that the Bank had not removed from its books loans it had sold into securitizations. FDIC Ex. 408.

122. On or about August 27, 1999, FDIC examiner Kristin Jertberg visited the office of Advanta and obtained records supporting the balances of loans owned by Keystone and serviced at Advanta. FDIC Ex. 408. Loans for code 405 were the only

loans owned by Keystone and were approximately $6 million for the relevant time period. FDIC Ex. 408. Remittance records from Advanta supported the total of $6 million in Keystone-owned loans rather than approximately $242 million the Bank was carrying on its books. FDIC Ex. 408.

123. On August 29, 1999, Quay and Buenger and several Keystone employees checked Keystone's remittances from Compu–Link and Advanta, and in less than two hours determined that the remittances were only a small fraction of the amount reported on Keystone's books, and that the remittances did not support Keystone's claimed ownership of $558 million in loans. Ellis, May 22, 2004, Tr. at 37–40, 78–80, 86, 94–95.

124. On August 30, 1999, the examiners presented their findings to senior management in Washington D.C. FDIC Ex. 408. A conference call was held with Church, Ellis, Graham, Quay, Reck and Compu–Link president, John LaRose. FDIC Ex. 408. Quay stated that he had no specific explanation for the $515 million discrepancy previously identified, but that he had discovered approximately $500 million in loans boarded by Compu–Link that the Bank was not getting credit for owning. FDIC Ex. 408. Quay later provided a spreadsheet listing the loans he claimed supported a $500 million "boarding error" at Compu–Link. FDIC Ex. 408. LaRose stated that this was false and the examiners insisted that an explanation for the $515 million discrepancy be provided first before dealing with the purported boarding error. FDIC Ex. 408.

125. Late in the evening of August 30, 1999, Ellis, Quay, and Gibson met at Webster's Restaurant in Bluewell, West Virginia. Quay and Ellis told Gibson that Church had admitted falsely reporting income from the missing loans on the Bank's books. Gibson, May 20, 2004, Tr. at 75.

126. On August 31, 1999, the examiners obtained affidavits from Compu–Link and Advanta attesting that the balances of Keystone owned loans serviced by them were, respectively, $31 million and $6 million. FDIC Ex. 408. Bank management failed to provide a plausible explanation for the missing loans, but did confirm that there was no additional cash influx from the loans beyond remittances the examiners had confirmed with the servicers. FDIC Ex. 408. The examiners concluded that the Grant Thornton auditors had been reconciling Bank generated documents with servicer reports the Bank had obtained in electronic format and "doctored," that they failed to "follow the audit trail on actual remittance received" by the Bank on loans it owned, and that even a small principal and interest analysis would have shown that "the volume of loans reported by the Bank was bogus." FDIC Ex. 408.

127. Meredith Hale, a native of McDowell County, West Virginia, was hired by Keystone in November, 1994. Hale Depo., August 27, 2002, 6–9 (FDIC Ex. 889). She had no previous work experience in the banking industry. Hale Depo., August 27, 2002, 9 (FDIC Ex. 889). As part of her job at Keystone, Hale received monthly reports from loan servicers during the 1998 time period. Hale Depo., August 27, 2002, 138, 140–41 (FDIC Ex. 889). Hard copies of the servicers' reports were kept in a file cabinet under the stairs near Church's office. Hale Depo., August 27, 2002, 142 (FDIC Ex. 889). Hale would do a monthly reconciliation to ensure that the servicers' records were correct. Hale Depo., August 27, 2002, 143–53 (FDIC Ex. 889). As part of this process Hale had electronic access to records at both Compu–Link and Advanta and communicated frequently with United Bank. Hale Depo., August 27, 2002, 146–53 (FDIC Ex. 889). Periodically, Church would give Hale a loan inventory list for reconciliation. Hale Depo., August

27, 2002, 153–55 (FDIC Ex. 889). Sometime between March and May, 1999, Hale noticed that Church had included approximately $400 million in United-owned loans as part of the Keystone inventory. Hale Depo., August 27, 2002, 156–59 (FDIC Ex. 889). Hale deleted the United loans from the Bank's inventory leaving only around $40 million in the Keystone inventory. Hale Depo., August 27, 2002, 156–59 (FDIC Ex. 889). Church told her she had done it wrong and that the deleted loans did not belong to United "outright." Hale Depo., August 27, 2002, 157 (FDIC Ex. 889). Hale testified that where United was paid the principal balance, the accrued interest, and the premium on the loan, it seemed to be that United owned the loan. Hale Depo., August 27, 2002, 157 (FDIC Ex. 889). Hale's testimony illustrates the ease with which the fraud could have been discovered had Grant Thornton made proper inquiry of the servicers, United, and even Hale.

128. Compu–Link and Advanta were both open and helpful in providing and explaining requested information. Johnson, May 17, 2004, Tr. at 111–12, 133–34; C. Wilson, May 17, 2004, Tr. at 223, 226–29; C. Wilson, May 18, 2004, Tr. at 63–64; Romero Depo., September 25, 2002, 266–67 (FDIC Ex. 905); FDIC Exs. 368, 369, 372, 408. From this, and other evidence of record, the court concludes that the same level of cooperation, disclosure and assistance would have been readily available to Grant Thornton's auditors.

129. The examiners concluded that the loans were not missing but were in fact owned by others. On Wednesday, September 1, 1999, the Bank was determined to be insolvent and was closed. Johnson, May 17, 2004, Tr. at 145. The OCC entered an order finding that Keystone had been including loans that it no longer owned as assets on its balance sheet. FDIC Exs. 405, 406. The Comptroller of the Currency appointed the FDIC as receiver for the insolvent Bank. Johnson, May 17, 2004, Tr. at 146; FDIC Exs. 405, 406, 407, 409. Had the discrepancy been discovered earlier the Bank would have been deemed insolvent and closed at that time since the Bank was critically undercapitalized. Johnson, May 17, 2004, Tr. at 148; C. Wilson, May 17, 2004, Tr. at 240.

130. Unlike Grant Thornton, the bank examiners were not conducting audits governed by professional auditing standards with the objective of determining whether the financial statements were fairly stated in all material respects. Blair, June 4, 2004, Tr. at 178. Specifically, the examiners had no responsibility to test Keystone's ownership of loans and reported interest income; the OCC relied on the Bank's outside auditors, i.e., Grant Thornton, to confirm the existence of the loan inventory. Blair, June 4, 2004, Tr. at 178–79. Because of their significance to Keystone's financial statements, confirming the existence of the loans was among Grant Thornton's chief duties. When the OCC put on their auditor "hat" in August of 1999 and confirmed the existence of the loan inventory, they were able to discover the fraud in approximately two weeks. Blair, June 4, 2004, Tr. at 179.

131. There is no evidence that the OCC or FDIC did anything to interfere with Grant Thornton's duties with respect to the Keystone engagement.

132. There is no evidence that the outside directors did anything to interfere with Grant Thornton's duties with respect to the Keystone engagement.

133. On the day the Bank was closed, Gary Ellis, then serving as President of Keystone, was politely, but summarily, ushered out of his office, relieved of the keys to his company vehicle, and left on the street in Keystone. G. Ellis, May 21, 2004, Tr. at 152–54. There is no evidence

whatsoever that Ellis had any role in perpetrating the fraud that led to the closure of Keystone, was aware of any of the fraudulent acts of McConnell, Cherry, Graham, Church, and others, or was in possession of any information or knowledge that would have made him suspect that such misconduct was going on.

### XI. FDIC's Damages

134. The court found the opinions of the experts of the FDIC and Gary Ellis—Douglas Carmichael, Harry Potter, and Lane Ellis—to be more persuasive than the expert witnesses offered by Grant Thornton, especially with respect to the issues of Grant Thornton's negligence and the appropriate measure of damages.

135. From April 21, 1999, until the Bank was closed on September 1, 1999, the additional cost of operations was $24,004,688. Potter, May 26, 2004, Tr. at 190–91; FDIC Exs. 627, 632, 633. This figure comprises expenses that would not have been incurred had Keystone been closed on April 21, 1999. Potter, May 26, 2004, Tr. at 160–61. This amount included expenses such as wages and salaries of Bank employees; interest paid on CDs, IRAs, and savings accounts; office supplies; legal, consulting, and accounting fees; directors' fees; utilities; etc. FDIC Ex. 632.

136. Keystone received $153,143 in revenues that it would not have received had the Bank been closed on April 21, 1999. Potter, May 26, 2004, Tr. at 190–91; FDIC Ex. 627.

137. On July 23, 1999, the Bank paid business operating taxes to McDowell County in the amount of $239,387. Potter, May 26, 2004, Tr. at 198; Potter, May 27, 2004, Tr. at 93; FDIC Ex. 627. Had the Bank been closed by April 21, 1999, these taxes would not have been paid. Potter, May 26, 2004, Tr. at 160–61.

138. A conservative estimate of the amount of interest the Bank would have received from April 21, 1999 until September 1, 1999 on loans originated after October 31, 1998 is $66,156. FDIC Ex. 627.

139. Based on the foregoing, from April 21, 1999, until the Bank was closed on September 1, 1999, the net additional cost of operations was $24,024,777.

140. From April 21, 1999, until the Bank was closed on September 1, 1999, the Bank paid dividends in the amount of $1,056,000. Potter, May 26, 2004, Tr. at 199–201; FDIC Exs. 626, 633. If the Bank had been closed by April 21, 1999, these dividends would not have been paid. Potter, May 26, 2004, Tr. at 200.

141. Grant Thornton was paid $595,400 in fees on the Keystone engagement. Potter, May 27, 2004, Tr. at 4–6; FDIC Ex. 624. This amount includes $60,150 for tax services and Lewtan model services. Potter, May 27, 2004, Tr. at 5; FDIC Ex. 624.

142. The net worth comparison, which Grant Thornton contends is the appropriate measure of damages, would actually have resulted in a *greater* damage figure. Potter, May 26, 2004, Tr. at 159–60; Potter, May 27, 2004, Tr. at 104–05. Grant Thornton has countered this argument by contending that the value of the residuals actually increased during the relevant time period. In support of this contention, Grant Thornton offered the expert testimony of Dr. John McConnell.

143. According to McConnell, more likely than not, the value of the Keystone residuals increased over the various damage windows considered by Potter. McConnell, June 7, 2004, Tr. at 148. The methodology McConnell used to support his opinion was what he referred to as a "comparable security valuation approach." McConnell, June 7, 2004, Tr. at 149. Essentially, McConnell compared the Keystone residuals to Fannie Mae interest only securities, i.e., the counter bond in-

dex.[2] McConnell, June 7, 2004, Tr. at 156–57, 180. The prices of the Fannie Mae interest only securities increased from October 1998 until the end of 2000. McConnell, June 7, 2004, Tr. at 158. Based on his opinion that Keystone residuals moved in the same direction as the Fannie Mae interest only securities, McConnell concluded that the prices of the Keystone residuals would have increased 23 percent from April 19, 1999 until September 1, 1999. McConnell, June 7, 2004, Tr. at 161–62; GT Ex. 297.

144. McConnell never did a valuation of the Keystone residuals. McConnell, June 7, 2004, Tr. at 147, 184. McConnell also conceded that if the Keystone residuals did not respond to interest rates in the same way as the Fannie Mae interest only securities, his opinion would be of questionable validity. McConnell, June 7, 2004, Tr. at 181.

145. The court does not find persuasive McConnell's theory that, more likely than not, the value of the residuals increased from April 19, 1999 to September 1, 1999. Keystone's own financial statements showed the value of the residuals declined during the time period in question. McConnell, June 8, 2004, Tr. at 7. As of March 1999, Bear Stearns valued Keystone's residual interests in 1998–P2 at somewhere between zero and .35 percent. McConnell, June 8, 2004, Tr. at 12–13. Quay himself admitted that Keystone's valuation of the residuals was greater than their market value. Quay, June 4, 2004, Tr. at 29; FDIC Ex. 286. Under McConnell's methodology, as of year-end 1998, the value of the residuals would have been $569 million. McConnell, June 8, 2004, Tr. at 30. Grant Thornton's own audit of Keystone's financial statements indicated the value of the residuals would be $396 mil-

lion for the same time period. McConnell, June 8, 2004, Tr. at 30.

146. The Fannie Mae interest only securities were not similar enough to Keystone's residuals to support McConnell's conclusions. For example, prepayments on Fannie Mae mortgages slowed down between September 1998 and September 1999, resulting in an increase in value for that same period. McConnell, June 8, 2004, Tr. at 47–49. Interest rates also rose over the same period. McConnell, June 8, 2004, Tr. at 52. However, prepayments on Keystone loans went up during the same period. McConnell, June 8, 2004, Tr. at 50–52. According to McConnell, the expectation for Fannie Mae interest only securities is that when interest rates rise, prepayments will decrease. McConnell, June 8, 2004, Tr. at 69. Thus, Keystone's residuals did not move in the same direction as the Fannie Mae securities. McConnell, June 8, 2004, Tr. at 69.

147. Based on the foregoing, the court finds that the value of the Keystone residuals did not increase from April 19, 1999 to September 1, 1999.

### XII. *Gary Ellis' Damages*

148. As a result of the ensuing tumult, including the criminal investigation and ultimate conviction of several longtime Keystone officials, Ellis tried, but was unable to obtain, similar employment in the banking industry. G. Ellis, May 21, 2004, Tr. at 154–66; G. Ellis, May 22, 2004, Tr. at 5–7.

149. When Gary Ellis was employed at United his average compensation package was worth $319,000 per year. L. Ellis, May 26, 2004, Tr. at 16. The typical or normal retirement age in the banking industry for Gary Ellis would allow him to

---

**2.** The counter bond index is really an index of Fannie Mae interest only prices. McConnell, June 7, 2004, Tr. at 185.

retire on June 30, 2007. L. Ellis, May 26, 2004, Tr. at 22. The value of Gary Ellis' total compensation package at Keystone was approximately $460,000 per year. L. Ellis, May 26, 2004, Tr. at 16, 21.

150. The cumulative present value of Gary Ellis' loss of compensation as of May 26, 2004, was $2,015,181. L. Ellis, May 26, 2004, Tr. at 25. With adjustments for social security and pension, the total amount of Gary Ellis' loss, as of May 26, 2004, was $2,419,233. L. Ellis, May 26, 2004, Tr. at 30; Ellis Exs. 56, 57.

151. Gary Ellis has remained employable and able to work and has, since October of 2000, been employed by West Virginia State University. L. Ellis, May 26, 2004, Tr. at 32–33; G. Ellis, May 21, 2004, Tr. at 156–57, 160, 164.

152. The evidence failed to establish that Ellis' health impaired his ability to obtain a position in the banking industry. L. Ellis, May 26, 2004, Tr. at 32.

153. From 1999 until the date of trial, there were recurring openings for bank executives in West Virginia at the presidential and vice-presidential level. L. Ellis, May 26, 2004, Tr. at 40–41, 49; Blair, June 4, 2004, Tr. at 209–12.

154. After the failure of Keystone, Ellis made an extensive job search seeking a position in banking. He talked to at least two dozen people, but was unable to obtain a job in banking. G. Ellis, May 21, 2004, Tr. at 155–66; G. Ellis, May 22, 2004, Tr. at 5–7. He concluded the taint of being associated with the collapse of Keystone made it impossible for him to obtain a banking position. G. Ellis, May 21, 2004, Tr. at 162–63.

155. Based on the facts that Ellis was employable, desirous of working, and had an excellent reputation in banking prior to the Keystone collapse, and that positions in banking were available during the period of his search, the court concludes that Ellis' association with Keystone tainted his reputation to the extent that he could not continue his career in banking.

156. In October 2000, Ellis accepted a position at West Virginia State University. His salary there was about $48,000 per year; it has increased since then to roughly $52,000. G. Ellis, May 21, 2004, Tr. at 156–57.

157. Ellis' two-year, rolling contract with Keystone was worth approximately $460,000 per year; he received $140,625 from Keystone before it collapsed. L. Ellis, May 26, 2004, Tr. at 16, 21.

158. In order to serve as Keystone Bank's president, Ellis brought $49,500 of Keystone stock which is now worthless. G. Ellis, May 22, 2004, Tr. at 35–36; L. Ellis, May 26, 2004, Tr. at 30.

159. As a result of accepting the position of president of Keystone, Ellis lost a career in banking. The present value of his loss of overall compensation and other damages is $2,419,233, including the loss of the Keystone stock's value. L. Ellis, May 26, 2004, Tr. at 15–29; Ellis Exs. 56–58. This amount is calculated conservatively,[3] based on his income at United, through an anticipated retirement in June of 2007, and reduced for the mitigating effects of his present employment.

### XIII. Grant Thornton's Alleged Negligence With Respect to the Agreed–Upon–Procedures Work

160. The FDIC's claim that Grant Thornton should have discovered Keystone's misrepresentation of its loan portfolio by October 31, 1998, is based entirely upon Grant Thornton's undertaking to per-

---

**3.** According to Lane Ellis, Gary Ellis' salary at United was in the lower 30 percent of the range for banking executives.

form certain "agreed-upon-procedures" for Keystone. The FDIC's theory of liability with respect to the agreed-upon-procedures work is tied solely to alleged deficiencies in one of seven procedures—the "scanning" of general ledger accounts—outlined in the engagement letter between Grant Thornton and Keystone and on remarks by Stan Quay about the general ledger just prior to the October 29, 1998 meeting of the Keystone board of directors.

161. Although Keystone was required to retain new auditors pursuant to the terms of the Formal Agreement with the OCC, Grant Thornton had no role in the negotiation of that Agreement and was not a party to it. Carmichael, May 25, 2004, Tr. at 88–89, 97–98. Instead, Grant Thornton negotiated and entered into two contracts with the Bank to provide services. Buenger, June 1, 2004, Tr. at 132–33; Quay, June 3, 2004, Tr. at 28. These contracts were the audit engagement letter and the agreed-upon procedures engagement letter. FDIC Exs. 98, 101.

162. Keystone and Grant Thornton engaged in extended discussions in an effort to reach agreement on the terms of an agreed-upon-procedures engagement letter. They exchanged a number of drafts and did not finalize the agreement until October 22, 1998. Quay, June 3, 2004, Tr. at 29; Carmichael, May 25, 2004, Tr. at 86–87; FDIC Ex. 101.

163. The parties agree that the OCC had the right to approve the terms of the agreed-upon-procedures engagement letter. The evidence was undisputed at trial that, for several months after October 1998, the OCC withheld its approval and discussed with Quay modifications it wanted in the letter. Quay, June 3, 2004, Tr. at 29; Carmichael, May 25, 2004, Tr. at 99. Furthermore, the evidence shows that the OCC also withheld approval of the October 22, 1998 engagement letter. GT Ex. 159,

Schneck Depo, September 19, 2002, 111–12, 131–32 (GT Ex. 741). Final OCC approval on the terms of the engagement letter was not received until August 11, 1999, three weeks before the Bank closed, at a meeting between Quay and Ron Schneck of the OCC. Quay, June 3, 2004, Tr. at 101; Schneck Depo, September 19, 2002, 111–12, 131–32 (GT Ex. 741). The October engagement letter between Grant Thornton and the Bank, as well as the letter agreed to by the OCC the following August, contemplated that Grant Thornton would provide a written report setting forth the results of its agreed-upon procedures work. FDIC Ex. 101. The letter specifically provided that Grant Thornton could withhold its report if "unexpected circumstances" arose. FDIC Ex. 101. Both the FDIC's and Grant Thornton's liability experts agreed at trial that it was reasonable for Grant Thornton not to issue any report until the OCC signed off on the terms of the engagement letter. Carmichael, May 25, 2004, Tr. at 99; Goldman, June 8, 2004, Tr. at 217–18. No written report on Grant Thornton's agreed-upon-procedures work was ever completed or issued. Quay, June 3, 2004, Tr. at 166.

164. When Grant Thornton first began performing the agreed-upon-procedures, it did not undertake to do any scanning—and no scanning was done. The scanning procedure did not become part of the engagement letter until October 19, 1998. Quay, June 3, 2004, Tr. at 29–30. When the scanning provision was inserted into the engagement letter—on October 19, 1998—scanning was not required to be completed until March 31, 1999. Buenger, June 1, 2004, Tr. at 140; FDIC Ex. 101.

165. Based on the foregoing, the court concludes that Grant Thornton had no contractual duty to perform scanning prior to October 31, 1998, and has no factual basis on which to find that, if Grant Thornton

had begun scanning work in August or September of 1998—which it was not required and did not undertake to do—it would have uncovered the fraud by October 31, 1998.

## CONCLUSIONS OF LAW

### I. *Jurisdiction and Venue*

Except as otherwise provided by act of Congress, the district courts have original jurisdiction of all civil actions commenced by the United States or by any agency thereof. 28 U.S.C. § 1345. Under 12 U.S.C. § 1819(b)(1), the FDIC is an agency of the United States for purposes of 28 U.S.C. § 1345. Therefore, this court has jurisdiction over the consolidated civil action as filed by the FDIC, receiver for Keystone.

This court has supplemental jurisdiction over the claim of plaintiff Gary Ellis under 28 U.S.C. § 1367, because it is so related to the claims of the FDIC that it forms part of the same cause or controversy under Article III of the United States Constitution. *United States v. Mfrs. Hanover Trust Co.*, 231 F.Supp. 160 (S.D.N.Y. 1964). Ellis' claim was originally asserted as a cross-claim against Grant Thornton and arises from a common nucleus of facts with the claims of the FDIC.

Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to plaintiffs' claims occurred in the Southern District of West Virginia.

### II. *Law Applied*

■ Where the FDIC is a party in its capacity as receiver and litigation involves the rights of creditors, depositors and stockholders, the substantive law of the state where the cause of action arose is applicable except where some provision of the Financial Institution Reform, Recovery and Enforcement Act (FIRREA) provides otherwise. *O'Melveny & Myers v. FDIC.*, 512 U.S. 79, 84–85, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994); *Resolution Trust Corp. v. Fid. and Deposit Co. of Md.*, 205 F.3d 615, 626 (3d Cir.2000); *Am. Nat'l Bank of Jacksonville v. FDIC*, 710 F.2d 1528, 1534 (11th Cir.1983). Therefore, the court has looked to the substantive law of West Virginia in assessing the rights and liabilities of the parties to this consolidated civil action.

Absent special circumstances, federal district courts must decide questions involving the application of state law even if they are extremely difficult to resolve. *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813–18, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976); *Meredith v. Winter Haven*, 320 U.S. 228, 234, 64 S.Ct. 7, 88 L.Ed. 9 (1943); *Wohl v. Keene*, 476 F.2d 171, 174–75 (4th Cir.1973). When state law is unsettled, the federal court must attempt to predict how the state's highest court would rule if confronted with the issue. *Commissioner of Internal Revenue v. Estate of Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967); *Food Lion, Inc. v. Capital Cities/ABC Inc.*, 194 F.3d 505, 512 (4th Cir. 1999); *Sanderson v. Rice*, 777 F.2d 902, 905 (4th Cir.1985); *Hatfield v. Palles*, 537 F.2d 1245, 1248 (4th Cir.1976).

In the absence of direct authority, the federal court may look to state high court decisions in related or analogous cases for an indication of how the state's highest court is likely to rule. *Perez–Trujillo v. Volvo Car Corp. (Sweden)*, 137 F.3d 50, 55 (1st Cir.1998). In absence of other authority, federal courts may follow the considered dicta of the state's highest court. *Anderson v. Nissan Motor Co., Ltd.*, 139 F.3d 599, 601 (8th Cir.1998); *State Farm Fire & Cas. Co. v. Fullerton*, 118 F.3d 374, 378 (5th Cir.1997); *McKenna v. Ortho Pharm. Corp.*, 622 F.2d 657, 662–63 (3d Cir.1980). Additionally, a federal court may examine cases from other jurisdic-

tions to determine what law the controlling state would adopt. *Ross v. Creighton Univ.*, 957 F.2d 410, 414–15 (7th Cir.1992); *Teletronics Int'l, Inc. v. CNA Ins. Co./ Trans. Ins. Co.*, 120 Fed.Appx. 440, 444–45 (4th Cir.2005) (unpublished).

"In determining state law, a federal tribunal should be careful to avoid the danger of giving a state court decision a more binding effect than would a court of that state under similar circumstances. Rather, relevant state precedents must be scrutinized with an eye toward the broad policies that informed those adjudications, and to the doctrinal trends which they evince." *McKenna*, 622 F.2d at 662.

Where the issues in this case are somewhat unsettled under West Virginia law, the parties have offered the law of other jurisdictions in an effort to support their respective positions. In making its Conclusions of Law herein, the court has relied on only those cases which it feels are reflective of the way the West Virginia Supreme Court of Appeals would decide the issue.

### III. Accounting Malpractice

■ In order to recover on a claim of professional malpractice, the plaintiff must show: (1) the existence of a legal duty owed by the defendant to the plaintiff, (2) a breach of that duty, and (3) damages proximately caused by the breach. *See Sewell v. Gregory*, 179 W.Va. 585, 371 S.E.2d 82, 84 (1988). In the case of a client suing a retained professional for negligence, the existence of a duty is established by virtue of the client hiring the professional. *See Calvert v. Scharf*, 217 W.Va. 684, 619 S.E.2d 197, 203 (2005); *McGuire v. Fitzsimmons*, 197 W.Va. 132, 475 S.E.2d 132, 136–37 (1996).

The standard of care applicable to an accountant's preparation of a report depends upon generally accepted accounting practices. *First Nat'l Bank of Bluefield v. Crawford*, 182 W.Va. 107, 386 S.E.2d 310,

313 (1989); *see also United States v. Arthur Young & Co.*, 465 U.S. 805, 811, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984) ("By examining the corporation's books and records, the independent auditor determines whether the financial reports of the corporation have been prepared in accordance with generally accepted accounting principles.").

■ An accountant who undertakes to perform professional services for a client is required to exercise the knowledge, skill, and ability ordinarily possessed and exercised by members of the profession in similar circumstances. *Keister v. Talbott*, 182 W.Va. 745, 391 S.E.2d 895, 898 (1990); *Weaver v. Union Carbide Corp.*, 180 W.Va. 556, 378 S.E.2d 105, 107 (1989).

"An auditor who undertakes to examine the books and audit the accounts of a client does not guarantee the correctness of the accounts. He does undertake to use skill and due professional care and to exercise good faith and to observe generally accepted auditing standards and professional guidelines, with the appropriate reasonable, honest judgment that a reasonably skillful and prudent auditor would use under the same or similar circumstances." *Mishkin v. Peat, Marwick, Mitchell & Co.*, 744 F.Supp. 531, 538 (S.D.N.Y.1990).

Compliance with Generally Accepted Accounting Standards (GAAS) and Generally Accepted Accounting Practices (GAAP) is strong evidence that an auditor has conducted himself with due professional care. However, such compliance is not dispositive and does not end the inquiry. *Keister*, 391 S.E.2d at 898; *see also Kemin Indus., Inc. v. KPMG Peat Marwick, LLP*, 578 N.W.2d 212, 217 (Iowa 1998); *Maduff Mortgage Corp. v. Deloitte, Haskins & Sells*, 98 Or.App. 497, 779 P.2d 1083, 1086 (Or.Ct.App.1989).

■ By Order dated May 12, 2004, the court denied Grant Thornton's Motion in Limine to Exclude Grant Thornton's Internal Guidance. In its motion, Grant Thornton argued that GAAP and GAAS are the *only* professional standards that apply to Grant Thornton's conduct. As discussed above, Grant Thornton is mistaken. West Virginia law is not such that an auditor's compliance with GAAP and GAAS fully discharges his duty to act with reasonable care and immunizes him from liability. Just as a violation of GAAP or GAAS is not negligence per se, neither does compliance with GAAP and GAAS end the inquiry of whether an auditor has exercised "the knowledge, skill, and ability ordinarily possessed and exercised by members of the profession in similar circumstances." *Keister,* 391 S.E.2d at 898. Certainly, compliance with GAAP and GAAS is strong evidence that an auditor has conducted himself in accord with the appropriate standard of care. Furthermore, in determining whether an accountant who undertakes to perform professional services has exercised "the knowledge, skill, and ability ordinarily possessed and exercised by members of the profession in similar circumstances," inquiry into GAAP and GAAS, the national standards, is necessary. *See, e.g., Mishkin,* 744 F.Supp. at 537–38 (concluding that deviation from professional standards "may be some evidence of negligence"); *Kemin Indus.,* 578 N.W.2d at 217 ("We are unable to accept the argument that the formalized standards of the American Institute of Certified Public Accountants are the only measure of professional negligence with respect to auditing activities."); *Maduff Mortgage Corp.,* 779 P.2d at 1086 ("[The AICPA standards] are principles and procedures developed by the accounting profession itself, not by the courts or the legislature. They may be useful to a jury in determining the standard of care for an auditor, but they are not controlling. The amount of care, skill and diligence to be used by defendant in conducting an audit is a question of fact for the jury, just as it is in other fields for other professionals.").

The "prudent auditor" rule set out in the cases cited above, and followed in West Virginia, recognizes that circumstances surrounding a given audit may require procedures not specifically called for in broadly stated formal standards, but that prudent and reasonable auditing practices nonetheless require. Accountants long have recognized that generally accepted accounting principles are far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions in all cases. *See Thor Power Tool Co. v. Comm'r of Internal Revenue,* 439 U.S. 522, 544, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979).

Grant Thornton's internal manual is relevant evidence of what Grant Thornton believes GAAP and GAAS require and what is necessary to comply with those standards. Therefore, the internal manual is probative on the issue of whether Grant Thornton violated its duties to the Bank and Gary Ellis.

An independent certified public accountant does not play the role of an advocate for its client. In order to properly do their job, auditors must not share common interests with the company they audit. The accountant owes ultimate allegiance to the corporation's creditors and stockholders and ultimately to the investing public. The independent auditor serves a "public watchdog" function requiring the accountant to maintain independence from the client. *Arthur Young & Co.,* 465 U.S. at 817–18, 104 S.Ct. 1495; *see also Medinol, Ltd. v. Boston Scientific Corp.,* 214 F.R.D. 113, 116 (S.D.N.Y.2002) ("[T]he auditor's interests are not necessarily aligned with the interests of the company. And, as has become crystal clear in the face of the

many accounting scandals that have arisen as of late, in order for auditors to properly do their job, they must not share common interests with the company they audit.").

Ordinarily in cases involving the question of professional malpractice, the issue is resolved through expert testimony. *First Nat'l Bank of Bluefield,* 386 S.E.2d at 314 n. 9.

■ Under West Virginia law, in the absence of privity of contract, an accountant is liable for the negligent preparation of a financial report or audit only to those he knows, or has reason to know, will be receiving and relying on the report or audit. *See id.* at 313. Conversely, if the auditor knows a third party will receive the report and rely upon it, the auditor is liable to the third party for damages resulting to the third party from the auditor's negligence in preparing the report. *See Cordial v. Ernst & Young,* 199 W.Va. 119, 483 S.E.2d 248, 260 (1996).

■ Grant Thornton knew that Gary Ellis, as a potential officer and director of Keystone, would be relying on its audit of Keystone. Ellis, in fact, relied on Quay's and Grant Thornton's negligent misrepresentations regarding Keystone's financial condition when he signed his employment agreement and was justified in doing so, making Grant Thornton liable.

## IV. Causation

### A. Proximate Cause in General

■ Under West Virginia law, a proximate cause of injury is a cause that, in natural and continuous sequence, produces foreseeable injury and without which the injury would not have occurred. *Hudnall v. Mate Creek Trucking, Inc.,* 200 W.Va. 454, 490 S.E.2d 56, 61 (1997). A plaintiff's burden of proof is to show that a defendant's breach of a particular duty of care was a proximate cause of the plaintiff's injury; it is not necessary to prove that it

was the sole proximate cause. *Mays v. Chang,* 213 W.Va. 220, 579 S.E.2d 561, 565 (2003). Thus, West Virginia requires the plaintiff to prove (1) that the injury would not have occurred without the defendant's negligence, and (2) that the injury was a foreseeable result of that negligence.

Where the wrongful act is a failure to perform a duty and performance of the duty would have prevented the harm, causation is established at least where the harm was reasonably foreseeable in the event of a dereliction. *Bernstein v. Crazy Eddie, Inc.,* 702 F.Supp. 962, 986 (E.D.N.Y.1988); *see also In re Gouiran Holdings, Inc.,* 165 B.R. 104, 106 (E.D.N.Y.1994) (holding allegations that but for the accountant's malpractice, the plaintiff would not have suffered an increase in debt and embezzlement by its principals was sufficient to establish proximate cause).

■ The FDIC has proven that the losses for which it seeks recovery would not have occurred but for the negligence of Grant Thornton. FDIC has proved that if Grant Thornton had followed GAAS, it would have discovered and reported the fraud and insolvency of Keystone before April 19, 1999, which would have led to immediate closure of the Bank. Grant Thornton's failure to follow GAAS thus resulted in the prolongation of the life of the Bank for the period from April 21, 1999 until September 1, 1999, a time during which the Bank continued to incur significant net operating losses.

Harry Potter's damage calculation of $25,080,777 includes only those expenses that would not have been incurred if the Bank had been closed as of April 21, 1999, offset by revenues and appropriate credits received during the same period. Potter, May 26, 2004, Tr. at 160–61. Thus, "but for" Grant Thornton's gross negligence,

the FDIC would have avoided $25,080,777 in losses.

## B. Foreseeability

■ FDIC has also satisfied the "foreseeable injury" prong of the West Virginia proximate cause test. From the standpoint of a reasonably prudent auditor, it is foreseeable that the failure to discover that the Bank has lost hundreds of millions of dollars and is hopelessly insolvent will result in a continuation of those losses. Potter, May 27, 2004, Tr. at 8–11; Osborne, June 7, 2004, Tr. at 48–51.

Grant Thornton's negligence in failing to discover the fraud at Keystone allowed that fraud to continue, and the losses that the FDIC seeks to recover are the foreseeable result of that ongoing fraudulent scheme. As Grant Thornton's expert conceded, it is certainly foreseeable from the standpoint of a reasonably prudent auditor that the failure to discover fraud will result in the continuation of the fraud. Osborne, June 7, 2004, Tr. at 48–51. *See Lincoln Grain, Inc. v. Coopers & Lybrand,* 216 Neb. 433, 345 N.W.2d 300, 308–09 (1984) (explaining that a CPA should reasonably foresee that his failure to detect material errors or falsifications in a client's books during an audit will likely result in continued errors and falsifications).

Gary Ellis suffered foreseeable harm to his career which was caused by his reliance on Grant Thornton's negligent, material misrepresentations in deciding to leave United Bank for the position at Keystone. He has been "tainted" and unable to find employment in banking since Keystone's collapse, despite an otherwise spotless employment record and appropriate efforts to find such employment. He has, however, found full-time employment in higher education, at a much lower salary.

Much ado has been made by Grant Thornton that the decision of the Fifth Circuit Court of Appeals in *Askanase v. Fatjo,* 130 F.3d 657 (5th Cir.1997), defeats the FDIC's theory of causation. In essence, Grant Thornton argues that as long as an auditor does not give specific advice that leads to a losing transaction, the auditor can perform a negligent audit but nonetheless be immune from any liability for subsequent losses because its negligence would have done nothing more than "furnish the condition that made the plaintiff's injury possible." First and most importantly, the court does not believe that the West Virginia Supreme Court of Appeals would adopt this position. Furthermore, this strained interpretation of *Askanase* is simply off the mark. A careful reading of the opinion and the case it cites reveals nothing more than an affirmation of the well-settled principle that damages are recoverable only if they are a natural and foreseeable consequence of the negligent act.

In *Askanase,* Ernst & Young completed an allegedly negligent audit opinion for LivingWell on March 31, 1987. *See id.* at 668. LivingWell filed for bankruptcy on October 27, 1989. *See id.* The Bankruptcy Trustee filed suit against Ernst & Young bringing claims for breach of contract, negligence, gross negligence, fraud, and fraud based conspiracy. *See id.* at 663. The negligence claims were thrown out as time-barred by the statute of limitations. *See id.* at 668–69. The court also found that Texas law did not permit a breach of contract claim based upon accounting malpractice. *See id.* at 676.

As to the fraud claims, the Trustee argued "that but for Ernst & Young's alleged misrepresentation, LivingWell would not have continued to exist, could not have incurred more debt, and would not have lost more money." *Id.* Finding the Trustee's theory of detrimental reliance to be insufficient, the *Askanase* court held:

Under Texas law, a cause of action is legally insufficient if the defendant's alleged conduct did no more than furnish the condition that made the plaintiff's injury possible. The Trustee's theory would make Ernst & Young an insurer of LivingWell because Ernst & Young would be liable for LivingWell's losses no matter what created LivingWell's losses, i.e., a recession or a decline in the fitness industry. Because the Trustee does not adequately allege detrimental reliance, his fraud claim must fail.

*Id.*

Grant Thornton has seized upon the foregoing language as support for its argument that Grant Thornton cannot be held liable for the damages claimed by the FDIC. The court does not agree.

Some of the differences between the case at bar and *Askanase* bear mentioning. As noted in the Findings of Fact, during the period of Grant Thornton's audit, Keystone was being carefully scrutinized by federal regulators. Indeed, it was because of this scrutiny and demands on the part of the OCC that Grant Thornton was hired in the first place. Further, it is indisputable that had Grant Thornton's audit report reflected Keystone's true financial position, the Bank would have been closed in a matter of days. The unique position that Keystone was in at the time period in question—with federal regulators carefully watching the Bank's actions and waiting for assurances from the outside auditor that the Bank's financial statements were accurate—distinguish this case from any of the other cases relied upon by the parties, including *Askanase.*

The *Askanase* opinion gives no assurances that had Ernst & Young issued an audit report that was correct that LivingWell would have been closed at an earlier date. Unlike Keystone, there was no government entity ready to swoop in and close LivingWell. LivingWell was a business trying to stay afloat by restructuring debt, changing the organization, and similar methods. In the case of Keystone, a bank that was hopelessly insolvent, the Bank would not have been given the option of trying to stay open: the regulators would have stepped in and promptly closed the Bank.

Bluntly put, Grant Thornton's tortured interpretation of the quoted language in *Askanase* just doesn't make sense. Under Grant Thornton's theory, an auditor would never be liable for performing a negligent audit. The very nature of an audit is that an accountant opines on the fairness of an entity's financial statements. FDIC Ex. 438 (AU 110.01). Thereafter, in reliance on that audit, an entity makes business decisions to act or not act in certain ways. Thus, it could be argued that an auditor never does more than "furnish the condition that made the plaintiff's injury possible." This cannot be the case and the court does not believe that the West Virginia Supreme Court of Appeals would so find.

In any event, in this case, Grant Thornton did more than "furnish the condition." It affirmatively acted when it issued its audit report and that opinion effectively kept the Bank open.

Further, the court does not believe that anything in *Askanase* is really inconsistent with its decision herein. In *Askanase,* it was the plaintiff's failure to consider the foreseeability of the claimed damages that troubled the court, who concluded that the plaintiff's theory "would make [the accounting firm] an insurer of [the insolvent company] because [the accounting firm] would be liable for [the insolvent company's] losses *no matter what created [those] losses." Askanase,* 130 F.3d at 676 (emphasis added). The emphasized phrase is critical because it reveals that the foreseeability component

was not part of the plaintiff's damage equation. In other words, the plaintiff in *Askanase* included all damages that would not have accrued "but for" the defendant's misconduct and made no effort to consider whether the claimed damages were a natural and foreseeable consequence of the alleged negligence. In that context the court's statement that it is not enough to merely furnish the condition that makes the injury possible is entirely accurate and consistent with reams of case law.[4] The FDIC, unlike the plaintiff in *Askanase*, included only those losses that were natural and foreseeable results of Keystone's continued operations. Notably, Grant Thornton never pointed to a single expense included in Mr. Potter's analysis that was not a natural and foreseeable loss to Keystone from its continued operation beyond the time of Grant Thornton's audit. It was highly foreseeable that Keystone would continue to pay interest expense on deposits, dividends, legal fees, consulting fees, salaries, and other routine operating expenses. Moreover, with Keystone's deposit (liability) balance being nearly ten times larger than its loan (asset) balance, it was a virtual certainty that the Bank would continue to lose money for as long as it operated. Accordingly, losses stemming from these natural and foreseeable events are an appropriate component of damage attributable to Grant Thornton's negligent audit that failed to uncover the Bank's true state of affairs. *See Lincoln Grain, Inc. v. Coopers & Lybrand,* 216 Neb. 433, 345 N.W.2d 300, 308–09 (1984) (explaining that a CPA should reasonably foresee that his failure to detect material errors or falsifications in a client's books during an audit will likely result in continued errors and falsifications).

A similar analysis guided the court in *Comeau v. Rupp,* 810 F.Supp. 1172 (D.Kan.1992).[5] The accountants in *Comeau* argued that the FDIC had no evidence that the accountants' negligence caused any of the FDIC's claimed damages relating to losses sustained on 19 loans the failed S & L purchased after the accountants had conducted their audits. *See id.* at 1176–77. The FDIC's theory of causation was that if the auditors had advised the S & L of its precarious financial condition, the board of directors would not have purchased the loans that resulted in the losses. *See id.* Like Grant Thornton in this case, the accountants in *Comeau* argued that in order to prove causation, the FDIC had to prove that the accountants made specific representations that caused the S & L to purchase the loans from which the losses flowed. *See id.* at 1176–77.

4. The case from which *Askanase* takes the language that it is not enough to "furnish the condition that made the plaintiff's injury possible" involved an individual suing a gas pump company because the pump exploded, requiring the fire department to put out the fire with water. This, in turn, caused a nearby surface to be wet and slippery and an individual fell and sustained injuries. *See Union Pump Co. v. Allbritton,* 898 S.W.2d 773, 776 (Tex.1995). The court in that case quite appropriately ruled that while the exploding gas pump "furnished the condition" that made the slip and fall injury possible, the relation between the two was simply too attenuated to constitute legal causation. Grant Thornton has also cited the West Virginia cases of *Perry v. Melton,* 171 W.Va. 397, 299 S.E.2d 8 (1982), and *Wehner v. Weinstein,* 191 W.Va. 149, 444 S.E.2d 27 (1994). These cases are in the same vein as *Askanase* (i.e. the claimed injury was not a natural and foreseeable consequence of the alleged negligence).

5. The reader should note that there are two opinions cited in this case with citations that are almost identical. This opinion should not be confused with *Comeau v. Rupp,* 810 F.Supp. 1127 (D.Kan.1992).

The court observed that while the accountants' argument might apply in the context of a fraud claim,[6] it had no place in a claim for negligence where causation was to be determined "according to the same principles of proximate cause governing any negligence action." *Id.* at 1177. The court then cited the following principles of proximate cause:

Proximate cause of an injury is that cause which in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury and without which the injury would not have occurred, the injury being the natural and probable consequence of the wrongful act. Moreover, although foreseeability is an element of proximate cause, it is not necessary that a defendant should have been able to anticipate the precise injury. A negligent act may be considered a proximate cause of the injury if by the exercise of reasonable care it might have been foreseen or anticipated that some injury might result.

*Id.* (internal citations and quotations omitted). Then, in an observation that illuminates the error in Grant Thornton's interpretation of *Askanase,* the court stated, "Thus, one who *negligently creates a dangerous condition* cannot escape liability for the natural and probable consequences thereof." [7] *Id.* (emphasis added).

Applying these principles to the case before it, the court, in a statement tailormade for this case, concluded as follows:

As to proximate cause, therefore, the issue is not whether the Accountants expressed a negligently-formed opinion as to the soundness of specific loans purchased by [the defunct S & L]. And

it is certainly not a question of whether the Accountants "caused" the loans to sustain losses (which would effectively grant auditors absolute immunity against malpractice actions). Rather, the inquiry is whether it was reasonably foreseeable to the Accountants that the lending and/or loan servicing practices of [the defunct S & L], if unchecked, could be expected to result in loan losses of the type sustained by [the defunct S & L].

*Id.* at 1177–78. Accordingly, the court found that proximate cause was adequately supported by the FDIC's allegations that (1) the accountants allowed a dangerous condition to continue unheeded by the board, (2) this dangerous condition led the board to purchase the bad loans, and (3) such loans would not have been purchased but for the accountants failure to alert the board of the institution's true financial condition. *Id.* at 1178.

This is precisely the theory the FDIC advanced in this case. First, Grant Thornton's negligent audit allowed a dangerous condition to continue, i.e., Keystone's continued operations despite the fraud and overwhelming insolvency. Second, this dangerous condition led to the Bank continuing to pay foreseeable interest expense, dividends, salaries, etc. Third, these foreseeable expenses would not have been incurred but for Grant Thornton's failure to alert the board of Keystone's true financial condition. As stated in the findings of fact, the FDIC established each of these points at trial, and thus its theory of causation is sound.

**6.** *Askanase* was a fraud case.

**7.** The harmony of the *Comeau* and *Askanase* opinions can be seen in that the *Comeau* court limited damages to those that were "natural and probable consequences" of the negligence and the *Askanase* court rejected an attempt to collect all losses "no matter what created [those] losses." Therefore, the two decisions are entirely consistent; both require damages to be the natural and foreseeable consequence of the negligence.

## C. Intervening and Superseding Cause

"An intervening cause, in order to relieve a person charged with negligence in connection with an injury, must be a negligent act, or omission, which constitutes a new effective cause and operates independently of any other act, making it and it only, the proximate cause of the injury." *Wehner v. Weinstein,* 191 W.Va. 149, 444 S.E.2d 27, 32–33 (1994) (quoting *Perry v. Melton,* 171 W.Va. 397, 299 S.E.2d 8 (1982)). Grant Thornton argues that the conduct of Keystone's inside directors, outside directors, and the federal regulators was an intervening or superseding cause of the damages suffered by the FDIC.

### 1. *Imputation*

At various times, Grant Thornton has argued that the actions and knowledge of Keystone's directors and officers should be imputed to the FDIC. The FDIC has responded that the actions and knowledge of Keystone's directors and officers cannot, under West Virginia law, be imputed to the receiver either for the purpose of asserting affirmative defenses or claims. The court found the FDIC's position to be the more persuasive. *See* Order of 9/29/2002 filed in *Gariety v. Grant Thornton, LLP,* 2:99cv0992. Grant Thornton has raised the argument again in its Proposed Findings of Fact and Conclusions of Law.

In an action brought by the FDIC as receiver, state law governs the imputation of knowledge of the failed institution's management to the receiver. *See O'Melveny & Myers v. FDIC,* 512 U.S. 79, 84–85, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994). Accordingly, the law of West Virginia controls. The West Virginia Supreme Court of Appeal's ("WVSCA") opinion in *Cordial v. Ernst & Young,* 199 W.Va. 119, 483 S.E.2d 248 (1996), appears to be West Virginia's clearest statement on the doctrine of imputation. *Cordial* involved an accounting malpractice suit brought by the West Virginia Insurance Commissioner, as receiver for Blue Cross and Blue Shield of West Virginia. On appeal from a jury verdict in Ernst & Young's favor, one point addressed by the WVSCA was whether the West Virginia Insurance Commissioner had standing to bring claims on behalf of the creditors and policyholders of Blue Cross and Blue Shield. In short, the WVSCA held that the Insurance Commissioner had standing to sue on behalf of all parties affected by a defunct insurer because the receiver is appointed to benefit the failed corporation and the policyholders, creditors, shareholders, and the public. *Cordial,* 483 S.E.2d at 257. In addition to this holding, however, the WVSCA had opportunity to address whether Ernst & Young could assert the defense that because Blue Cross' managers knew the company's true financial condition, it could not bring a valid claim against Ernst & Young for improper accounting. *See id.* at 257 n. 9. The WVSCA stated that "since [the] Commissioner, acting as receiver, is vindicating the rights of the public, including the Blue Cross creditors, policyholders, providers, members, and subscribers, we find no merit in this contention." *Id.*

In the course of its holding, the WVSCA cited with approval *Resolution Trust Corporation v. KPMG Peat Marwick,* 845 F.Supp. 621 (N.D.Ill.1994). The WVSCA stated that:

[T]he *Resolution Trust* court discussed whether the receiver was subject to certain defenses which the accounting firm could assert against the bank in receivership. We find some of the court's comments instructive toward the standing issue herein addressed. The *Resolution Trust* court observed that public policy concerns mandate a finding that the duty of FDIC to collect on assets of

a failed institution runs to the public and not to the former officers and directors of the failed institution. The *Resolution Trust* court continued: Self-evidently, it is the public which is the intended beneficiary of FSLIC, just as it is the public which is the beneficiary of the common law duty imposed upon officers and directors to manage properly the institutions entrusted to their care.

*Id.* at 257 (internal citations and quotations omitted).

While the *Cordial* court cited *Resolution Trust* in its standing analysis, its adoption of the view that a receiver represents the public is crucial. If a receiver is viewed as representing the public, it follows that a suit against a receiver is a suit against the public. The FDIC argues that, based on the WVSCA's view of receivers, it has adopted the position "the FDIC as Receiver for a failed bank is not liable for the misconduct of bank management." While the court does not agree that the WVSCA has yet taken this position, the court must nonetheless attempt to predict what the WVSCA would do if asked to adopt this rule.

In considering the law of other jurisdictions, the court finds the United States Court of Appeals for the Ninth Circuit's decision in *FDIC v. O'Melveny & Myers*, 61 F.3d 17 (9th Cir.1995), to be particularly persuasive. The *O'Melveny* court stated:

> We recognize that, in general, "[a] receiver occupies no better position than that which was occupied by the person or party for whom he acts … and any defense good against the original party is good against the receiver." *Allen v. Ramsay*, 179 Cal.App.2d 843, 854, 4 Cal. Rptr. 575 (1960). However, this rule is subject to exceptions; defenses based on a party's unclean hands or inequitable conduct do not generally apply against that party's receiver. *See Camerer v.*

*California Sav. & Commercial Bank*, 4 Cal.2d 159, 170–71, 48 P.2d 39 (1935). While a party may itself be denied a right or defense on account of its misdeeds, there is little reason to impose the same punishment on a trustee, receiver or similar innocent entity that steps into the party's shoes pursuant to court order or operation of law. Moreover, when a party is denied a defense under such circumstances, the opposing party enjoys a windfall. This is justifiable as against the wrongdoer himself, not against the wrongdoer's innocent creditors. As we noted in our earlier opinion:

> A receiver, like a bankruptcy trustee and unlike a normal successor in interest, does not voluntarily step into the shoes of the bank; it is thrust into those shoes. It was neither a party to the original inequitable conduct nor is it in a position to take action prior to assuming the bank's assets to cure any associated defects or force the bank to pay for incurable defects. This places the receiver in stark contrast to the normal successor in interest who voluntarily purchases a bank or its assets and can adjust the purchase price for the diminished value of the bank's assets due to their associated equitable defenses. In such cases, the bank receives less consideration for its assets because of its inequitable conduct, thus bearing the cost of its own wrong.

Also significant is the fact that the receiver becomes the bank's successor as part of an intricate regulatory scheme designed to protect the interests of third parties who also were not privy to the bank's inequitable conduct. That scheme would be frustrated by imputing the bank's inequitable conduct to the receiver, thereby diminishing the value of the asset pool held by the receiver

and limiting the receiver's discretion in disposing of the assets. *See Gulf Life*, 737 F.2d at 1517; *cf., Langley v. FDIC*, 484 U.S. 86, 91–92, 108 S.Ct. 396, 401–02, 98 L.Ed.2d 340 (1987).

In light of these considerations, we conclude that the equities between a party asserting an equitable defense and a bank are at such variance with the equities between the party and a receiver of the bank that equitable defenses good against the bank should not be available against the receiver. To hold otherwise would be to elevate form over substance—something courts sitting in equity traditionally will not do. *See Drexel [v. Berney]*, 122 U.S. [241,] 254, 7 S.Ct. [1200,] 1205, 30 L.Ed. 1219 [ (1887) ]. Of course, it does not necessarily follow that equitable defenses can never be asserted against ... a receiver; we hold only that the bank's inequitable conduct is not imputed to [a receiver].

*Id.* at 19.

The court also finds persuasive the opinion in *Comeau v. Rupp*, 810 F.Supp. 1127 (D.Kan.1992). In *Comeau*, Grant Thornton took the position that the wrongful actions of the bank's officers must be imputed to the FDIC. The court concluded that Grant Thornton could not impute the knowledge or conduct of bank officers and directors "for the purpose of asserting the defense of contributory negligence against the FDIC's claims, or for the purpose of claiming indemnity from the FDIC." *Id.* at 1142–43. The court first noted that if the conduct of the officer's was attributed to the FDIC:

then the public would be made to pay for wrongs that it was in no real position to prevent[.] ... Such a policy would defeat rather than further the tort principle of compensating the victim, while doing nothing either to deter culpable parties from refraining from tortious conduct, or to encourage the sharehold-

ers to employ more trustworthy corporate managers.

*Id.* at 1142. As a further basis for its holding, the *Comeau* court noted that no inequity would result:

in withdrawing from the [Grant Thornton's] litigation arsenal a defense that would normally be available. [Grant Thornton] seek[s] to impute the Rupps' conduct to the FDIC for two reasons: (1) to set up the defense of contributory negligence to their own negligence as alleged by the FDIC, and (2) to obtain indemnity from the FDIC in the event that they are found liable to the Comeaus. *See* 762 F.Supp. at 1441. In either case, the relief sought by [Grant Thornton] would come into play only upon plaintiff's initial showing of some culpable conduct on the part of [Grant Thornton]. But by imputing to FDIC the torts of RCSA's officers, [Grant Thornton] would shift [its] liability for plaintiff's losses to the FDIC. Thus, this is not a case where a wholly innocent party will be called upon to pay for a loss caused by another. To the contrary, allowing the FDIC to disavow the wrongful acts of RCSA's former officers prevents culpable parties from transferring liability for their tortious conduct to an entity that is indisputably without fault in bringing about RCSA's losses: the public, in the person of the FDIC.

In any event, refusing to impute to the FDIC the conduct and knowledge of RCSA's managers does not lessen plaintiff's burden to prove that its losses were caused by [Grant Thornton's] wrongful conduct. In other words, [Grant Thornton] may still argue that the knowledge and actions of the Comeaus and/or Rupps, although not attributable to the RCSA, were the legal cause of plaintiff's losses, which could

not have been prevented by more prudent accounting practices.

*Id.*

Another decision the Court finds persuasive and consistent with West Virginia law is *In re Jack Greenberg, Inc.,* 240 B.R. 486 (Bankr.E.D.Pa.1999), a well reasoned decision that thoughtfully analyzes the doctrine of imputation in the context of auditor liability. In that case a Chapter 7 trustee of a bankrupt corporation filed suit against Grant Thornton for failure to discover or rectify fraud committed by the corporation's vice-president. Grant Thornton moved for summary judgment on the basis that the vice-president's knowledge and conduct must be imputed to the corporation and thus the trustee. *See id.* at 500. In resolving the imputation issue, the court observed,

> [A]uditor liability cases do not fit squarely within the traditional law on imputation.... The imputation theory grew out of actions, most frequently brought by financial institutions, to recover on obligations that were created through the fraudulent acts of their agents. Notably, in these cases, the plaintiff was seeking to recover from an innocent party. The policy reason for imputing the knowledge of the wrongdoer to the plaintiff employer was explained by the Pennsylvania Supreme Court:

> > Where one of two innocent persons must suffer by the fraud or negligence of a third, whichever of the two has accredited him, ought to bear the loss.

Unlike traditional imputation cases, in auditor liability cases the plaintiff is not seeking to retain the benefit of a fraudulent transaction and the defendant is not an innocent party. Thus, while the imputation doctrine may be applied in auditor liability cases, the doctrine was not crafted with that purpose in mind.

*Id.* at 507–08 (quoting *Gordon v. Continental Cas.,* 319 Pa. 555, 181 A. 574, 577 (1938)).

The *Greenberg* court then looked to the cases of *Cenco, Inc. v. Seidman & Seidman,* 686 F.2d 449 (7th Cir.1982) and *Schacht v. Brown,* 711 F.2d 1343 (7th Cir. 1983) wherein the imputation defense in auditor liability cases has received its most comprehensive analyses. The court found in these cases an "express recognition ... that the objectives of tort liability are the touchstone by which a court should decide whether to invoke the doctrine [of imputation] in the context of a suit against a corporation's professional advisers." *Greenberg,* 240 B.R. at 508. The objectives of tort liability were identified as compensating the victims of wrongdoing and deterring wrongdoing. *See id.* at 509. After carefully analyzing the facts of the case before it in light of these underlying objectives, the *Greenberg* court ultimately reached the conclusion that imputation of knowledge should not be invoked if the proceeds of a recovery would benefit innocent creditors, while the doctrine should be applied if the proceeds would benefit culpable shareholders. *See Greenberg,* 240 B.R. at 517. Stated another way, imputation is an equitable defense that should not be applied if it will produce an inequitable result such as sparing a blameworthy accounting firm at the expense of innocent creditors.[8] *See id.* at 504–05. That is

---

8. The holding in *Greenberg* was subsequently disapproved by the Tenth Circuit in *Official Committee of Unsecured Creditors v. R.F. Lafferty & Co.,* 267 F.3d 340 (3rd Cir.2001), in the context of a suit brought by a bankruptcy trustee. The *Lafferty* court explained that the *Greenberg* rationale was "preferable from a public policy perspective" and implied that it

would join most other courts in approving of *Greenberg's* holding in the context of a receiver as opposed to a bankruptcy trustee. The court concluded, however, that the case before it required strict application of Section 541 of the Bankruptcy Code and that *Greenberg's* holding was contrary to the statute. In the case at bar, however, the FDIC is the

precisely what the result would be if the court were to apply the doctrine of imputation in this case. Any recovery by the FDIC will ultimately inure to the benefit of the public. If the FDIC's claims were barred or diminished by virtue of imputation, the FDIC and thus the public would be deprived a recovery while Grant Thornton would enjoy a free pass for its negligent accounting work. This outcome would be patently inequitable and the equitable defense of imputation should not permit it.

Essentially, Grant Thornton is attempting to have the public pay for the acts of Keystone management by using their illegal and improper behavior as a defense to the FDIC's claims. Undoubtedly, the regulatory scheme designed to protect bank investors "would be frustrated by imputing the bank's inequitable conduct to the receiver, thereby diminishing the value of the asset pool held by the receiver and limiting the receiver's discretion in disposing of the assets." *O'Melveny*, 61 F.3d at 19. To hold the public responsible for the illegal acts of the Keystone officers is a result this court cannot justify. Neither would the WVSCA should the issue come before it.

But even if this conclusion were in error, the Court concludes that Keystone's management had abandoned the interests of Keystone and was acting adversely to Keystone's interests for their own personal gain. Accordingly, imputing their knowledge and/or conduct to the FDIC would be improper under the adverse interest exception to imputation. *See Clark v. Milam*, 872 F.Supp. 307, 310 (S.D.W.Va.1994).

Aside from seeking to impute the knowledge of Keystone's corrupt insiders to the FDIC, Grant Thornton has argued that the FDIC should be barred from recovery because of the alleged negligence of Keystone's innocent outside directors. The essence of Grant Thornton's claim appears to be that the outside directors, while not involved in any fraudulent conduct, negligently allowed the fraud to flourish under their watch. The court concludes, however, that the principles articulated above would apply with equal force even if the court were to find that the outside directors were negligent. West Virginia law will not permit Grant Thornton to shift the loss caused by its negligence to the FDIC, regardless of whether the source of proposed imputation is guilty or innocent.

Moreover, "courts have adopted a modified form of contributory negligence in the case of auditor malpractice actions." *Comeau v. Rupp*, 810 F.Supp. 1172, 1181 (D.Kan.1992). Under this modified form, "the contributory negligence of the client is a defense only where it has contributed to the accountant's failure to perform the contract and to report the truth." *Lincoln Grain, Inc.*, 345 N.W.2d at 307. The justification for this modified form of contributory negligence was articulated as follows:

> We are ... not prepared to admit that accountants are immune from the consequences of their negligence because those who employ them have conducted their own business negligently. The situation in this respect is not unlike that of a workman injured by a dangerous condition which he has been employed to rectify. Accountants, as we know, are commonly employed for the very purpose of detecting defalcations which the employer's negligence has made possible. Accordingly, we see no reason to hold that the accountant is not liable to his employer in such cases.

*National Sur. Corp. v. Lybrand*, 256 A.D. 226, 236, 9 N.Y.S.2d 554 (1939). There

receiver of Keystone, and the Bankruptcy Code is not in play. Accordingly, the Court

concludes that the *Greenberg* analysis is appropriate.

was no evidence of negligence on the part of Keystone's outside directors that contributed to Grant Thornton's failure to properly carry out its responsibilities at Keystone.

However, even if negligence on the part of the outside directors could be imputed to the FDIC, Grant Thornton still would not carry the day. In *Bradley v. Appalachian Power Co.*, 163 W.Va. 332, 256 S.E.2d 879 (1979), West Virginia's highest court adopted the doctrine of comparative negligence [9] and held that "[a] party is not barred from recovering damages in a tort action so long as his negligence does not equal or exceed the combined negligence or fault of the other parties involved in the accident." The evidence in this case failed to establish that the outside directors were negligent in the issuance of Grant Thornton's audit report.

### 2. *Pre-receivership Conduct of Federal Regulators* [10]

 Grant Thornton argues that the pre-receivership conduct of the OCC was an intervening and superseding cause of the damages to Keystone, sufficient to break the causal chain between any negligence on the part of Grant Thornton and the damages incurred by Keystone. First, Grant Thornton says that regulators had been examining the Bank for several years and had not found the fraud, and thus it is unfair and unreasonable to expect Grant Thornton to have uncovered the fraud in a

comparatively short period of time. Second, Grant Thornton contends that the regulators were negligent in not discovering the fraud and closing the Bank before Grant Thornton's arrival, and thus the regulators' negligence is the sole proximate cause of all damages the FDIC seeks to recover from Grant Thornton. Third, Grant Thornton contends that the regulators should have discovered the fraud and closed the Bank at various points after Grant Thornton's arrival, and their failure to do so constitutes an intervening and superseding cause. Fourth, Grant Thornton contends that the regulators had information concerning Keystone records and management that would have been useful to Grant Thornton in evaluating the Keystone engagement, including whether or not to accept it in the first place, but the regulators did not share that information with Grant Thornton.

As explained more fully below, the court concludes that Grant Thornton's arguments are legally irrelevant to the issue of whether Grant Thornton breached its professional duties to Keystone and thereby caused the damages the FDIC seeks to recover.

The court does not believe that anything the regulators did or failed to do in their regulatory capacity should operate to reduce or defeat the FDIC's claim against Grant Thornton in this case so long as the regulators did not actually interfere with

---

**9.** The *Bradley* court used the term "comparative negligence" as a shorthand method of referring to comparative contributory negligence. *King v. Kayak Mfg. Corp.*, 182 W.Va. 276, 387 S.E.2d 511, 514 (1989).

**10.** By Order entered May 12, 2004, the Court granted the FDIC's motion in limine to exclude evidence of the alleged pre-receivership failures of the federal regulators. In so doing, the court was and still is of the opinion that the alleged failures of the regulators is not relevant to the issues of whether Grant

Thornton was negligent with respect to its work at Keystone. In other words, the fact that the FDIC or OCC had not discovered the fraud at an earlier date would not absolve Grant Thornton of liability. Grant Thornton was, however, still free to argue that the conduct of the regulators (during the time of Grant Thornton's engagement) was an intervening and superseding cause to Grant Thornton's negligence. For these reasons and as explained more fully herein, the motion in limine was granted.

Grant Thornton's undertakings. *See FDIC v. Ernst & Whinney*, No. 3–87–364, 1987 WL 39943 (E.D.Tenn.1987). As the *Ernst & Whinney* court observed:

> While E & W is free to argue that its audits were not the proximate cause of the losses sustained, if, in fact, it failed to perform its audits in accordance with generally accepted auditing standards, it cannot be heard to claim that the FDIC was a joint tortfeasor. The FDIC's regulatory activities are simply not parallel to E & W's auditing responsibilities and give rise to no duty to warn directors, officers or shareholders of any improprieties.... The Court does not believe that any actions on the part of the FDIC or the banks in question, prior to their closing, can serve as a defense to accounting malpractice unless they involve an actual interference with the auditor's duties.

*Id.* at *2. There is no evidence that the regulators interfered with Grant Thornton's duties at Keystone, and thus, any reference to alleged deficiencies in the regulators' conduct has no relevance to this case.

Unlike Grant Thornton, the bank examiners were not conducting audits governed by professional auditing standards with the objective of determining whether the financial statements were fairly stated in all material respects. Specifically, the examiners had no responsibility to test Keystone's ownership of loans and reported interest income, whereas these were among Grant Thornton's chief duties in light of their significance to Keystone's financial statements upon which Grant Thornton was opining, and these procedures were the keys to discovering the fraud. Accordingly, the examiners' failure to discover the fraud sooner than they did is in no way relevant to whether Grant Thornton was negligent in carrying out its entirely separate responsibilities at Keystone.

Grant Thornton also argues that if the regulators had discovered the fraud and closed the Bank before Grant Thornton's arrival, all of the damages the FDIC seeks to recover from Grant Thornton would have been avoided. In other words, Grant Thornton would never have had the opportunity to be negligent if the regulators had not been negligent in the first place. Alternatively, Grant Thornton contends that the regulators should have closed the Bank at some point after Grant Thornton's arrival, and their failure to do so constitutes a superseding cause of all damages to Keystone.

The court notes that the principle of sovereign immunity prohibits Grant Thornton from joining federal regulators and seeking contribution. To the extent Grant Thornton's causation arguments are an attempted end run around that legal barrier, they are rejected. *See United States v. Gaubert*, 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991); *FDIC v. Jennings*, 615 F.Supp. 465, 467 (D.C.Okla. 1985) ("It is evident that the decisions of whether and how to intervene in failing banks is discretionary with the FDIC and thus falls within the discretionary function exception of the Federal Tort Claims Act."); *FDIC v. Carter*, 701 F.Supp. 730, 737 (C.D.Cal.1987) (holding that the discretionary function exception of the Federal Tort Claims Act protects federal regulators from any liability for negligence in examining a bank or for negligence in the decision to place an institution in receivership).

The crux of Grant Thornton's argument regarding the alleged failure to inform is that the regulators had information and concerns regarding Keystone management and record-keeping that were not communicated to Grant Thornton, and that if Grant Thornton had been aware of these concerns, it would have at least altered its

audit procedures and might have even refused the engagement altogether. Grant Thornton does not and cannot allege that the regulators lied in response to Grant Thornton's inquiries, but rather that they did not voluntarily assemble a package of agency-wide concerns regarding Keystone and present it to Grant Thornton. The argument fails because the regulators had no duty to disclose any information to Grant Thornton.

Courts have uniformly held that claims or defenses based upon pre-receivership actions of regulators are legally insufficient. *See, e.g., FDIC v. Ornstein,* 73 F.Supp.2d 277, 281 (E.D.N.Y.1999) (court struck affirmative defenses to the extent they relied on pre-receivership conduct by federal regulators); *FDIC v. Raffa,* 935 F.Supp. 119, 124 (D.Conn.1995) (because FDIC's oversight of banks is intended to protect only depositors, insurance fund and public, and FDIC owes no duty to bank's officers and directors, the FDIC cannot be held accountable for any alleged breach of duty or discretionary act made either pre- or post-bank closing); *FDIC v. Lowe,* 809 F.Supp. 856, 858 (D.Utah 1992) (well settled that affirmative defenses against FDIC in its capacity as regulator are insufficient as a matter of law); *FDIC v. Crosby,* 774 F.Supp. 584, 586 (W.D.Wash.1991) (regulatory conduct of FSLIC prior to receivership does not give rise to duty). *FDIC v. Ashley,* 749 F.Supp. 1065, 1068 (D.Kan.1990) (contributory negligence not available against FDIC for pre-closing activities).

The consequence of the principle underlying this line of cases is that the regulators' failure to do anything in their regulatory capacity cannot operate to reduce or defeat the FDIC's claim against Grant Thornton. If Grant Thornton failed to perform its services in accordance with applicable professional standards, "it cannot be heard to claim that the [OCC or FDIC] was a joint tort feasor. The [OCC's and FDIC's] regulatory activities are simply not parallel to [Grant Thornton's] auditing responsibilities and give rise to no duty to warn directors, officers, or shareholders of any improprieties." *Ernst & Whinney,* 1987 WL 39943, at *1; *see also Sedgwick v. FDIC,* 1999 WL 1495451, at *3 (D.Ariz.1999) ("The function of banking regulators such as the OTS and FDIC is aimed at protecting the federal deposit insurance funds and the public at large, not particular individuals.").

According to Grant Thornton, the existence of a duty is not necessary for the regulators' inactions to serve as an intervening/superseding cause. As support for this position, it points to the case of *Clark v. Milam,* 152 F.R.D. 66 (S.D.W.Va.1993).[11] According to *Clark:* "regardless of whether Plaintiff owed Defendants a duty, Plaintiff's acts could still theoretically break the chain of causation and absolve Defendants of liability." *Clark,* 152 F.R.D. at 72. Grant Thornton also argues that the Supreme Court's decision in *O'Melveny & Myers v. FDIC,* 512 U.S. 79, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994), somehow changed the landscape of the well-established rule discussed in the previous section that claims or defenses based on pre-receivership actions of regulators are legally insufficient. According to Grant Thornton, it does not matter that *O'Melveny* did not involve pre-receivership conduct of federal regulators. The court disagrees.

Much has been made in recent years of the *O'Melveny* decision's impact on the so-called "no duty" rule, and indeed there has been a split among district courts as to whether *O'Melveny* enables defendants to

---

**11.** The court notes that *Clark* is not binding authority on this court particularly where, as here, the case was decided by a fellow district judge attempting to interpret state law.

assert affirmative defenses based on the FDIC's *post-receivership* conduct. *See RTC v. Liebert,* 871 F.Supp. 370, 373 (C.D.Cal.1994) (discussing the split). This Court need not entangle itself in this debate because the conduct at issue here is *pre-receivership* conduct of federal regulators, an issue *O'Melveny* did not even address. The post *O'Melveny* cases holding that the FDIC owes a duty were decided in the post-receivership context. *See, e.g., FDIC v. Ornstein,* 73 F.Supp.2d 277 (E.D.N.Y.1999). In other words, they deal with the actions of the FDIC as receiver of a failed bank, as opposed to the pre-receivership conduct of the bank's regulators. Moreover, such cases specifically hold that no duty is owed for the pre-receivership acts of regulators. *Id.* at 281; *RTC v. Massachusetts Mut. Life Ins. Co.,* 93 F.Supp.2d 300, 304–05 (W.D.N.Y.2000).

In *Ornstein,* a case relied on by Grant Thornton, the New York district court considered the impact of *O'Melveny* on the "no duty" rule as it related to post-receivership mitigation of damages and found that, in that context, the "no duty" rule had been abolished by *O'Melveny.* But more importantly for purposes of this case was the court's discussion of defenses based on pre-receivership conduct:

> The FDIC's *Bernstein* argument does, however, serve to defeat the third affirmative defense, which apparently seeks to shift the blame for defendants' conduct to the actions of (non-FDIC) regulatory agencies taken before [Central Federal Savings Bank's] failure. This is analogous to the defense raised by the defendant in *Bernstein,* and it is foreclosed by the rule of that case. *See Bernstein,* 944 F.2d at 106; *see also RTC v. Sands,* 863 F.Supp. 365, 372–73 (N.D.Tex.1994) ("[P]re-conservatorship conduct of federal banking regulators cannot be attacked by directors."); *FDIC v. Cheng,* 832 F.Supp. 181, 187–88 (N.D.Tex.1993). Accordingly, the third

affirmative defense is struck [that their actions as directors "were mandated by federal regulatory agencies having or asserting jurisdiction over the acts and actions of the bank and its directors and officers"]. The fourth affirmative defense ["that any losses were caused not by defendants but by 'plaintiff and its predecessor' "], the basis of which is unclear, is struck to the extent that it relies on pre-receivership conduct by federal regulators.

*Ornstein,* 73 F.Supp.2d at 281 (citing *FDIC v. Bernstein,* 944 F.2d 101 (2d Cir. 1991)). Accordingly, the *Ornstein* court granted the motion to strike and motion in limine regarding any defenses or evidence relating to pre-receivership conduct of federal regulators, including evidence that such conduct caused the losses at issue.

Likewise, after considering *O'Melveny,* a Texas district court granted the FDIC's motion for summary judgment in part relating to twenty-one affirmative defenses to the extent they were "asserted against the FDIC in its corporate capacity for actions taken by it or other regulatory agencies." *FDIC v. Schreiner,* 892 F.Supp. 848 (W.D.Tex.1995). *Schreiner* relied upon *Resolution Trust Corp. v. Sands,* 863 F.Supp. 365 (N.D.Tex.1994), which observed that *O'Melveny* "does not affect the reasoning of *Mijalis [FDIC v. Mijalis,* 15 F.3d 1314 (5th Cir.1994) ] because the Fifth Circuit was addressing the FDIC's own conduct, not that which is attributable to it as receiver of a failed institution." *Schreiner,* 892 F.Supp. at 855.

As further evidence that pre-receivership conduct was not at issue in *O'Melveny,* the court stated as follows:

> [T]he rules of decision at issue here do not govern the primary conduct of the United States or any of its agents or contractors, but affect only the FDIC's

rights and liabilities, as *receiver*, with respect to primary conduct, on the part of private actors, that has already occurred.

*O'Melveny*, 512 U.S. at 88, 114 S.Ct. 2048 (emphasis added); *see also Resolution Trust Corp. v. Heiserman*, 1994 WL 907409, at *2 (D.Colo.1994) (*"O'Melveny* did not address, and is not applicable to, the affirmative defenses stricken in this case [of contributory and comparative negligence, failure to mitigate, waiver, estoppel, ratification, consent, acquiescence, assumption of risk, laches, unclean hands, lack of causation, intervening and superseding causes and reliance to the extent they implicate the conduct of federal regulatory agencies]. The sole affirmative defense addressed in *O'Melveny* was the defense of imputed knowledge.").

Given the fact that *O'Melveny* did not address the issue of pre-receivership conduct by regulators, there is no basis for this Court to stray from the long line of cases holding that the regulators' conduct in connection with regulating or examining a bank does not give rise to a claim or defense. For example, in *Harmsen v. Smith*, 586 F.2d 156, 157 (9th Cir.1978), directors of a bank claimed that the OCC was negligent in performing bank examinations, in supervising employees who performed the examinations, and in failing to discover illegal or unsound banking practices. The district court held that the OCC owed no duty to the bank or its shareholders for breach of which a negligence action would lie and, further, that the discretionary function exception to the Federal Tort Claims Act, 28 U.S.C. § 2680(a), prevented an action based upon the act in question. *See id.* at 157.

The court also stated that nothing in the language of the statutory directive to conduct bank examinations, 12 U.S.C. § 481, purported to impose any duty on the OCC or Comptroller to protect shareholders.

*See id.* The statutes concerning federal examination of national banks were designed to provide the Comptroller with information necessary to carry out regulatory functions, and while "bank examinations may reveal irregularities and even fraud, which discoveries may redound to the benefit of innocent persons, including stockholders, that result is merely an incidental benefit to the examined banks." *Id.* Moreover, the court stated, "We agree with every other court that has considered the issue that the federal scheme of bank regulation creates no duty from the Comptroller to shareholders and directors of national banks." *Id.* The legislative purpose behind bank examinations contains nothing to suggest that Congress intended "private actions against the Comptroller for a failure to perform or carelessly performing his statutory duties." *Id.* at 158. While the Comptroller is statutorily obligated to undertake bank examinations, these statutes were designed by Congress to afford guidance to the Comptroller in exercising its regulatory functions. *Id.* Therefore, the OCC owes no duty to the banks, including their shareholders, it examines.

In *First State Bank of Hudson County v. United States*, 599 F.2d 558, 561 (3d Cir.1979), the bank argued that the FDIC had actual knowledge of misapplication of funds or, alternatively, had failed to discover the malfeasance and thus violated the standard of due care. The court concluded that the FDIC owed no duty to warn the bank because nothing in the Federal Deposit Insurance Act purported to establish any duty requiring that the FDIC warn banks of irregularities perpetuated by their officials. *Id.* at 563. Further, the FDIC was not acting for the benefit of the bank or the bank's depositors and other creditors. *Id.* The court stated, "If bank examinations by the FDIC reveal any irregularities or fraud, such

examinations, though they may inure incidentally to the benefit of a bank, are intended primarily for the protection of the insurance fund." *Id.* The court ultimately held that "the Federal Deposit Insurance Act imposes no duty on the FDIC to warn the officers and directors of a bank about wrongdoing committed by one of its officials and discovered by the FDIC. The duty to discover fraud in their institution is upon bank directors and they may not transfer it to the FDIC by the easy expedient of purchasing insurance protection from it." *Id.* at 563–64. Additionally, "Congress intended the examinations to be a valuable means of protecting the important interests of the federal insurance fund, not a direct measure to protect the banks from misconduct and shortcomings of their officials and employees." *Id.* at 564.

Similarly, the OCC and FDIC in their regulatory capacities do not owe a duty to an independent auditor to voluntarily disclose information or to close a bank at a certain time. The OCC regulates banks and is statutorily obligated to conduct examinations of banks, but it does not owe a duty to them. Independent auditors are further removed from this obligation and thus, since the OCC does not owe a duty to the banks (including their shareholders) it examines, it is abundantly clear that the OCC does not owe a duty to an independent auditor such as Grant Thornton. *See FDIC v. Collins,* 920 F.Supp. 30, 34 (D.Conn.1996).

For these reasons, the Court concludes that no action or inaction on the part of federal regulators can serve as a defense to a claim for accounting malpractice unless such action involved actual interference with conducting the audit. There is no evidence that any such interference occurred in this case.

As a final note, even if the pre-receivership conduct of the OCC and FDIC could serve as an intervening and superseding cause that breaks the causal chain between any negligence on the part of Grant Thornton and the losses alleged by the FDIC, it would not do so in this case. Simply put, the pre-receivership conduct of the FDIC and OCC at issue was not "a negligent act, or omission, which constitutes a new effective cause and operates independently of any other act, making it and it only, the proximate cause of the injury."

## V. Damages

### A. Damages in General

■ The objective of awarding damages for negligent conduct is to put the plaintiff, insofar as possible, in the same position it would have been in if the tort had not been committed. *Hannah v. Heeter,* 213 W.Va. 704, 584 S.E.2d 560, 571 (2003). Recoverable damages are limited to those that can reasonably be expected to flow from the tortious conduct. *Mueller v. Am. Elec. Power Energy Servs., Inc.,* 214 W.Va. 390, 589 S.E.2d 532 (2003).

■ "As in all damages awards for tortious injury, '[i]nsistence on mathematical precision would be illusory and the judge or juror must be allowed a fair latitude to make reasonable approximations guided by judgment and practical experience.' " *Sea–Land Servs., Inc. v. Gaudet,* 414 U.S. 573, 590, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974) (quoting *Whitaker v. Blidberg Rothchild Co.,* 296 F.2d 554, 555 (4th Cir.1961)). "[I]f a plaintiff can demonstrate that the defendant's acts caused him economic loss and so establish liability, the plaintiff will also be able to establish 'facts and circumstances tending to show the probable amount of ... damages' sufficient to allow the trier of fact to form a 'reasonable and probable estimate' of recoverable damages." *Miller v. Asensio & Co., Inc.,* 364 F.3d 223, 231 (4th Cir.2004) (quoting *Story Parchment Co. v. Paterson Parchment Pa-*

*per Co.,* 282 U.S. 555, 565, 51 S.Ct. 248, 75 L.Ed. 544 (1931)). "If a plaintiff proves liability and damages which are definitively attributable to the wrong, a jury's award of damages will be upheld even if there is some uncertainty as to their amount." *Id.* (internal citations and quotations omitted); *see also Smith v. White,* 77 W.Va. 377, 87 S.E. 865, 866 (1916) ("[A]lthough the damages are substantial, the amount is largely a matter of conjecture, and all the court can do is to determine, from the conflicting evidence, such an amount as, in its judgment, is reasonable."); *Pickens v. Coal River Boom & Timber Co.,* 58 W.Va. 11, 50 S.E. 872, 875 (1905) ("And where, from the nature of the case, the amount of damages cannot be estimated with certainty, or only a part of them can be so estimated, we can see no objection to placing before the jury all the facts and circumstances of the case having any tendency to show damages, or their probable amount, so as to enable them to make the most intelligible and probable estimate which the nature of the case will admit.").

The evidence in this case establishes that: 1) the Bank was insolvent because of the fraudulent activities of McConnell, Church, Graham, and others; 2) the FDIC would have promptly closed the Bank upon discovery of the insolvency; and 3) but for the negligence of Grant Thornton, the fraud and the Bank's insolvency would have been discovered by April 19, 1999.

The theory of damages adopted by Harry Potter, the FDIC's damages expert, which he characterized as a "cash out the door" method, objectively measured additional costs incurred by the Bank after April 21, 1999. This method is distinct from what is called a "deepening insolvency" analysis. Deepening insolvency attempts to measure damages incurred by an insolvent business that tries to stay afloat by borrowing, declining to pay accounts due, and similar tactics. Such tactics would not have been open to the Bank here because the FDIC and/or OCC would have shut it down as soon as its insolvent condition became apparent. Cases disallowing deepening insolvency as a theory of damages for a failing business are thus distinguishable from this case.

In any event,

[t]here is a trend toward recognizing "deepening insolvency" as a cause of action against a party who creates the false appearance of solvency in an insurance company or other financial institution. As a result of this deception, regulatory authorities allow the company to keep operating, and do not place it into receivership in a timely fashion. Damages are measured by the dissipation of assets or increased debt load occurring after the false representation of solvency was made.

*Fla. Dep't. of Ins. v. Chase Bank of Tex.,* 274 F.3d 924, 935 (5th Cir.2001). The trend to which the Fifth Circuit was referring was detailed by the Third Circuit in *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.,* 267 F.3d 340 (3d Cir.2001):

Growing acceptance of the deepening insolvency theory confirms its soundness. In recent years, a number of federal courts have held that "deepening insolvency" may give rise to a cognizable injury to corporate debtors. *See* [*Schacht v. Brown,* 711 F.2d 1343, 1350 (7th Cir.1983)] (applying Illinois law and holding that, where a debtor corporation was fraudulently continued in business past the point of insolvency, the liquidator had standing to maintain a civil action under racketeering law); *Hannover Corp. of America v. Beckner,* 211 B.R. 849, 854–55 (M.D.La.1997) (applying Louisiana law and stating that "a corporation can suffer injury from fraudulently extended life, dissipation of

assets, or increased insolvency"); *Allard v. Arthur Andersen & Co.*, 924 F.Supp. 488, 494 (S.D.N.Y.1996) (applying New York law and stating that, as to suit brought by bankruptcy trustee, "[b]ecause courts have permitted recovery under the 'deepening insolvency' theory, [defendant] is not entitled to summary judgment as to whatever portion of the claim for relief represents damages flowing from indebtedness to trade creditors"); *In re Gouiran Holdings, Inc.*, 165 B.R. 104, 107 (E.D.N.Y.1994) (applying New York law, and refusing to dismiss claims brought by a creditors' committee because it was possible that "under some set of facts two years of negligently prepared financial statements could have been a substantial cause of [the debtor] incurring unmanageable debt and filing for bankruptcy protection"); *Feltman v. Prudential Bache Securities*, 122 B.R. 466, 473 (S.D.Fla.1990) (stating that an " 'artificial and fraudulently prolonged life ... and ... consequent dissipation of assets' constitutes a recognized injury for which a corporation can sue under certain conditions", but concluding that there was no injury on the facts). Some state courts have also recognized the deepening insolvency theory. *See, e.g., Herbert H. Post & Co. v. Sidney Bitterman, Inc.*, 219 A.D.2d 214, 639 N.Y.S.2d 329 (N.Y.App. Div. 1st Dep't 1996) (applying New York law and allowing a malpractice claim for failing to detect embezzlement that weakened a company, which already was operating at a loss, thereby causing default on loans and forcing liquidation); *Corcoran v. Frank B. Hall & Co.*, 149 A.D.2d 165, 175, 545 N.Y.S.2d 278 (N.Y.App. Div. 1st Dep't 1989) (applying New York law and allowing claims for causing a company to "assume additional risks and thereby increase the extent of its exposure to creditors").

*Id.* at 362 (3d Cir.2001).

The unifying theme among these cases, and the explicit direction from the Fifth Circuit in *Chase Bank*, is that in a deepening insolvency case, damages are to be measured by the foreseeable dissipation of assets from the entity's continued operations. To properly quantify the dissipation of Keystone's assets caused by its continued operations during each damage window, it was necessary to capture those foreseeable expenses that would not have been incurred but for the Bank's continued operations and reduce them by those revenues that would not have been received but for the Bank's continued operations. This approach necessarily excluded from consideration expenses and revenues that would have been incurred or received regardless of whether the Bank continued to operate because such amounts had no relation to the causative event of continued operations. *See LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363, 1373 (Fed.Cir.2003) ("[U]nrelated events ... do not reduce the liability of the wrongdoer for the losses caused by the wrong.").

That is precisely what Mr. Potter did in this case. Potter testified that his methodology was a subset of the deepening insolvency analysis—taking only those elements of the deepening insolvency that were proximately caused by the conduct of Grant Thornton.[12] Potter first tallied the

---

**12.** If Potter had included all changes in Keystone's asset values, as Grant Thornton suggests that he should, this would have resulted in a much higher damage number because it would have included the decline in the value of the residuals, the losses on the B–Certificates, and the collapse of the 1997 P–1 securitization. Potter, May 27, 2004, Tr. at 104–05. Therefore, Grant Thornton has not been prejudiced by Potter's election not to use a pure deepening insolvency analysis.

foreseeable payments that Keystone would not have made if the Bank had ceased operations after Grant's negligence. From these amounts Mr. Potter subtracted those revenues that would not have been received if the Bank had ceased operations. These revenues included interest income on new loans originated after a damage window, increased interest income from short term investment of newly received deposits, and bank operation revenues after a damage date such as loan underwriting fees, check cashing fees, safety deposit box rentals, and the like. Items such as interest income on loans originated before a liability date and distributions from the prior existing securitization transactions were not included as a credit because these revenues would have been (and were) received whether or not the Bank closed. As a result these revenues were not causally linked to Keystone's continued operations and thus could not properly reduce the amount of damages. *See LaSalle Talman Bank*, 317 F.3d at 1373.

Grant Thornton has persistently advanced the argument that the only acceptable method of computing damages in this case is to compare Keystone's net worth at the beginning and end of each damage window. In support of this position, it relies on the case of *Lively v. Rufus*, 207 W.Va. 436, 533 S.E.2d 662 (2000). *Lively* is not on point. *Lively* held that "the proper measure of damages for the *destruction* of a business is the difference between the fair market value of the business before and after its destruction." *Lively*, 533 S.E.2d at 670 (emphasis added). That measure makes sense when the claim is that the defendant destroyed the business. The plaintiff is alleging, in such cases, that the business's entire loss of value is attributable to the defendant's conduct.[13] The issue before the Court in this case, however, is not the destruction of a business, but rather the improper prolonging of the life of a business where foreseeability must be taken into consideration. Accordingly, *Lively* is simply off point. Here again, the distinct nature of this case is crucial—because of the regulatory oversight of the FDIC and OCC, the Bank would have been closed as soon as its insolvent condition was discovered, a discovery Grant Thornton's negligence postponed.

Even Grant Thornton's damages expert, Roger Osborne, explained that a pure net worth comparison is inappropriate. Mr. Osborne explained that after starting with a net worth comparison, one must then "look at the potential reasons that that net worth has changed during that period of time to see if it's appropriate to assign responsibility or blame for any adverse change to a particular party's wrongdoing." Osborne, June 7, 2004, Tr. at 15. In other words, you can only include those components of a change in net worth that are a foreseeable and natural consequence of the negligent act. This is simply another way of reaching the same result as Mr. Potter. For example, if the objective was to determine how many people attended an event in a 5000–seat facility, you could either count the number of empty seats and subtract it from 5000, or you could simply count the number of people. Either approach would produce an accurate count. The same is true of the differing

13. In arriving at the means to calculate damages under the particular facts of the *Lively* case, the court began with the basic principle that the purpose of awarding damages is "to put the plaintiff in the same position, so as far as money can do it, as he would have been [in] if . . . the tort [had] not [been] committed." *Lively*, 533 S.E.2d at 668 (internal citations omitted). As demonstrated above, the measure of damages used by Mr. Potter and the FDIC in this case places the FDIC where it would have been "but for" Grant Thornton's malfeasance and is a proper measure of damages under West Virginia law.

methodologies adopted by Mr. Osborne and Mr. Potter. Mr. Osborne would ostensibly start with a change in net worth and then back out those components that are unforeseeable and not causally linked to the conduct (an indirect approach), whereas Mr. Potter simply tallies the foreseeable components that are causally linked to the negligence (a direct approach). Either approach, properly applied, produces an accurate result. In sum, Mr. Potter's damage computation is entirely consistent with applicable case law regarding how to quantify damages in a case of this nature.

As Mr. Potter made clear at trial, the largest element of damage to Keystone was the interest expense it continued to pay after it should have been closed—an amount that indisputably reduced Keystone's net worth and would thus be encompassed by Grant Thornton's approach. Yet in an effort to avoid this component of damage, Grant Thornton has argued that Keystone's obligation to pay interest existed before Grant Thornton arrived and thus would have been on the Bank's books even if Grant Thornton had found the fraud on October 31, 1998. But Grant Thornton's assertion that the obligation to pay interest had accrued before Grant Thornton's arrival is simply wrong. While the deposit liability was obviously on the books at all relevant times, Keystone's obligation to pay interest on this amount accrued with the passage of time so that if the Bank had been closed earlier, the interest expense would have never accrued or been paid, a point conceded by Mr. Osborne. Rouse, May 25, 2004, Tr. at 190–91; Osborne, June 7, 2004, Tr. at 50. For this reason the Court finds that Keystone's interest expense is an appropriate component of damages.

The FDIC suffered damages in the amount of $25,080,777. This amount includes the net additional cost of operations in the amount of $24,024,777 and dividends paid from April 21, 1999, until the Bank was closed on September 1, 1999, in the amount of $1,056,000.

The objective of compensatory damages under West Virginia law is not to adopt a certain methodology, but to place the injured party in the position it would have been absent the tortious conduct. The FDIC's damage computation ties damages to causation in a manner that heeds this objective. Accordingly, the Court concludes that the FDIC's damage computation is a reasonable and proper quantification of Keystone's damages stemming from Grant Thornton's misconduct.

## B. Fees Paid to Grant Thornton

 Of all the components of damages the FDIC seeks to recover, the fees paid to Grant Thornton are unique in that at least some of them would have been incurred even if the Bank had closed earlier. Certain courts have recognized that a party is entitled to recover payment of audit fees when the audit was so negligent as to fail in its essential purpose.

> While minor inaccuracies in an audit or report may be overlooked, where by reason of the accountant's negligence, inaccuracies and failure to report facts of serious character appear, he or she is not entitled to compensation. And when compensation is paid to an accountant in reliance upon his or her report, it may be recovered, upon proof that through the accountant's negligence, the audit was in substance, false.

*World Radio Labs., Inc. v. Coopers & Lybrand,* 251 Neb. 261, 557 N.W.2d 1, 15 (1996) (per curiam).

Even were the court to agree with those jurisdictions that allow a party to recover payment of audit fees when the audit was so negligent as to fail in its essential purpose, it would be impossible for the court

to do so in this case. Given the court's findings regarding Grant Thornton's negligence, the FDIC would be entitled to recover only those fees paid that related to the audit.[14] On the record before it, it would be difficult, if not impossible, for the court to determine how much of the $535,000 in fees paid to Grant Thornton was for work done on the audit. Therefore, the court has not included fees paid to Grant Thornton in its calculation of the FDIC's damages.

## C. Prejudgment Interest

 As to the FDIC's request that the court award prejudgment interest, 12 U.S.C. § 1821(*l*) provides:

In any proceeding related to any claim against an insured depository institution's director, officer, employee, agent, attorney, accountant, appraiser, or any other party employed by or providing services to an insured depository institution, recoverable damages determined to result from the improvident or otherwise improper use or investment of any insured depository institution's assets shall include principal losses and appropriate interest.

Accordingly, if prejudgment interest is available under West Virginia law in a case of this nature, the court may award prejudgment interest.

The statute governing the availability of prejudgment interest under West Virginia law provides as follows:

Except where it is otherwise provided by law, every judgment or decree for the payment of money entered by any court of this State shall bear interest from the date thereof, whether it be so stated in the judgment or decree or not: Provided, That if the judgment or de-

cree, or any part thereof, is for special damages, as defined below, or for liquidated damages, the amount of such special or liquidated damages shall bear interest from the date the right to bring the same shall have accrued, as determined by the court. Special damages include lost wages and income, medical expenses, damages to tangible personal property, and similar out-of-pocket expenditures, as determined by the court. The rate of interest shall be ten dollars upon one hundred dollars per annum, and proportionately for a greater or lesser sum, or for a longer or shorter time, notwithstanding any other provisions of law.

W.Va.Code § 56–6–31. This statute states that prejudgment interest can be recovered when the claim is either for liquidated damages or for special damages. Special damages, as defined by section 56–6–31, include "lost wages and income, medical expenses, damages to tangible personal property, and similar out-of-pocket expenditures, as determined by the court." W.Va.Code § 56–6–31. Moreover, under section 56–6–31, prejudgment interest on special or liquidated damages is recoverable as a matter of law. *Id.; Eriksen Constr. Co. v. Morey,* 923 F.Supp. 878, 880 (S.D.W.Va.1996) (interpreting West Virginia law).

One factor determining whether a plaintiff's damages constitute special damages under West Virginia law is whether the plaintiff can prove an ascertainable pecuniary loss. In *Capper v. Gates,* 193 W.Va. 9, 454 S.E.2d 54, 64 (1994), the Supreme Court of West Virginia held that "[i]n contract or tort actions, prejudgment interest is available to a litigant as part of compen-

---

**14.** Under the court's adopted theory of damages, the FDIC would also be able to recover an amount equaling the fees paid to Grant Thornton for work done after issuance of the audit report because if the Bank had been closed by April 21, 1999, those fees would never have been paid in the first place.

satory damages if there is an ascertainable pecuniary loss." Other cases have made similar holdings. *See, e.g., Eriksen Constr. Co.*, 923 F.Supp. at 880 (under West Virginia law, award of compensatory damages includes award of prejudgment interest); *Chafin v. Chafin*, 202 W.Va. 616, 505 S.E.2d 679, 690 (1998) (losses "capable of being rendered certain by reasonable calculation" may be subject to prejudgment interest); *Beard v. Lim*, 185 W.Va. 749, 408 S.E.2d 772, 776 (1991) (prejudgment interest is available on "ascertainable pecuniary loss").

Even assuming that the FDIC is entitled to prejudgment interest under FIR-REA, the court does not believe that the damages the FDIC seeks to recover are "special or liquidated damages" within the meaning of W. Va.Code § 56–6–31. Accordingly, the FDIC's request for an award of prejudgment interest is denied.

### D. Damages of Gary Ellis

 Ellis has suffered damages in the amount of $2,419,233.[15] Grant Thornton has made much ado about the damage figure that Ellis' expert, Lane Ellis, determined was applicable to Ellis' situation. Grant Thornton failed, however, to offer an alternative amount.

In this case, Ellis showed that Grant Thornton was negligent and that its negligence caused him economic loss. This loss was primarily in the form of an inability to earn future compensation at the level he had prior to Grant Thornton's negligence. The evidence at trial showed that, but for Grant Thornton's negligence, Gary Ellis would not have taken the job at Keystone. Consequently, he would never have purchased Keystone stock and he would likely have continued working at United or some other bank making roughly the same sala-

ry as he had during his many years at United. In the court's view, reliance on Gary Ellis' salary at United in ascertaining his damages makes the most sense given Gary Ellis' long tenure with that bank. Lane Ellis testified to several other possible methods for arriving at damages, none of which were preferable to the one chosen. Accordingly, the court finds that the $2,419,233 damage figure to be reasonable given the evidence in the case.

Grant Thornton also contends that Ellis cannot receive damages for this type of loss. However, under West Virginia law, it is clear that permanent physical impairment was not the only type of lasting consequence which would sustain an award of future damages, such as for future earnings. *See Cook v. Cook*, 216 W.Va. 353, 361, 607 S.E.2d 459 (2004) ("[W]e have determined that a permanent physical impairment is not the only type of lasting consequence which will sustain an award of future damages, including future earnings.... The relevant evidence of a lasting or permanent consequence is determined by the nature of the consequence and does not necessarily involve medical evidence; nevertheless, the relevant evidence in all cases must establish the lasting or permanent consequence to a reasonable degree of certainty.").

Ellis has established to a reasonable degree of certainty that his employment at Keystone during its demise has rendered him unable to secure an executive level position in banking.

### CONCLUSION

In view of the Court's findings and conclusions and Grant Thornton's failure to put forth sufficient evidence to support them, the Court determines that Grant

---

**15.** August 8, 2006, Ellis filed a motion to submit an updated damage figure. For certain of the reasons discussed in Grant Thorn- ton's opposition, that motion is DENIED and the court has not considered the revised damage figure.

Thornton's claims and counterclaims, to the extent that any remain viable, should be denied in entirety.

After these Findings of Fact and Conclusions of Law are filed, an Order will be entered deconsolidating the claim of Gary Ellis, Civil Action No. 1:04cv0043. As to Gary Ellis, a separate judgment will be entered this day, pursuant to Federal Rule of Civil Procedure 58, in accord with the foregoing findings of fact and conclusions of law. The court is aware that the amount of the credit, if any, Grant Thornton is entitled to receive because of the Kutak Rock settlement remains open for decision. The parties have seven days in which to file a brief, of no more than five pages, setting forth their positions on the most expeditious way to resolve the issue of the credit. Once the issue of the Kutak Rock credit is resolved, the court will enter final judgment on the FDIC's claims.